2019 IL App (1st) 170915

FIRST DISTRICT
FIRST DIVISION
January 22, 2019

No. 1-17-0915

| | | |
|---|---|---|
| STEVEN CRUZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | 16 CH 07062 |
| THOMAS J. DART, in His Official Capacity as Cook | ) | |
| County Sheriff, and THE COOK COUNTY SHERIFF'S | ) | |
| MERIT BOARD, | ) | The Honorable |
| | ) | Kathleen Pantle, |
| Defendants-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Griffin and Walker concurred in the judgment and opinion.

## OPINION

¶ 1 After an administrative hearing, the Cook County Sheriff's Merit Board (Merit Board or Board) issued a decision, granting Sheriff Thomas J. Dart's request to terminate Steven Cruz as a correctional officer with the Cook County Department of Corrections (CCDOC). The circuit court affirmed the Board's decision. On appeal, Officer Cruz contends that (1) the Merit Board's decision is void and must be vacated because the Merit Board was illegally constituted at the time of the termination proceedings, (2) the Board's findings were against the manifest weight of the evidence and clearly erroneous, (3) the decision to terminate him was arbitrary, unreasonable, and unduly harsh, and (4) the Board's decision was untimely and should be barred by the doctrine of *laches*. For the following reasons, we affirm the Board's finding that Officer Cruz used excessive force to subdue a detainee, but remand for reconsideration of the decision to terminate in response to this first offense by an officer who had never before been disciplined and had been previously attacked by an inmate.

¶ 2                               I. BACKGROUND

¶ 3     On August 4, 2014, Sheriff Dart filed a complaint, seeking to terminate Officer Cruz. In the complaint, the Sheriff alleged that while Officer Cruz was working in the receiving classification and diagnostic center on January 13, 2012, he used excessive force against a detainee, Levi Heard, by pushing Mr. Heard "with both hands to the chest twice and deploying Oleoresin Capsicum ('OC') spray directly into the face and eyes of [Mr. Heard] without warning, as [Mr. Heard] was being held from behind," in a headlock by another correctional officer.

¶ 4     The Sheriff also alleged that Officer Cruz failed to include in his reports that he pushed Mr. Heard twice or that he had deployed OC spray into Mr. Heard's face and eyes without warning. According to the complaint, Officer Cruz also falsely documented in the reports that Mr. Heard was attempting to escape when Officer Cruz deployed the OC spray.

¶ 5                          A. The Merit Board Hearing

¶ 6     The parties agreed to several joint exhibits, including Officer Cruz's use of force report from the incident, his incident report, his inmate disciplinary report, his officer battery report, and a summary from Officer Cruz's interview/administrative interrogation with the Office of Professional Review (OPR). The Sheriff also entered into evidence a videotape recording of the interaction between Officer Cruz and Mr. Heard, and Officer Cruz stipulated to its foundation and authenticity.

¶ 7     The videotape recording was not initially a part of the record on appeal, but we allowed a motion by the Sheriff to supplement the record with the recording. The recording does not include audio. Beginning at approximately 9:10 during the video's running time, as Mr. Heard is seen walking, Officer Cruz gestures at Mr. Heard from a distance, walks up to Mr. Heard, and then pushes Mr. Heard with enough force to cause Mr. Heard to move backwards a couple of

feet. Officer Cruz then communicates with Mr. Heard while standing toe-to-toe, and when Mr. Heard attempts to move around Officer Cruz to the officer's left, the officer pushes Mr. Heard with two hands again. Mr. Heard then throws down an object and walks to Officer Cruz's right while removing his jacket. As Mr. Heard turns to face Officer Cruz—who has followed Mr. Heard—while also attempting to remove his hooded sweatshirt, Officer Vukmarkaj puts Mr. Heard into a headlock with one arm and drags Mr. Heard away from Officer Cruz. It does not appear that Mr. Heard is actively struggling as Officer Vukmarkaj drags him. Officer Cruz follows Mr. Heard as he is dragged away and then, while Mr. Heard is still in a headlock, Officer Cruz walks up to Mr. Heard and sprays Mr. Heard directly in the face with the OC spray. The incident lasts approximately 23 seconds in total, and approximately 17 seconds from the first push to the deployment of the OC spray.

¶ 8     The first witness called on behalf of Sheriff Dart was Tia Parks, an investigator from the OPR. Ms. Parks testified that in her three years employed by OPR, she had taken part in "at least a hundred or so" use-of-force investigations. She testified that she was familiar with the Sheriff's use of force order and the general order governing the use of OC spray. Ms. Parks testified that she had been involved in "at least 30 to 50" investigations with respect to the use of OC spray.

¶ 9     Ms. Parks testified about the Desmedt Use of Force Model, which classifies detainees into three categories based on their actions: cooperative subject, resister, and assailant. According to the chart, for an officer to use OC/chemical agents against a detainee, the detainee must be classified at the least as a "moving resister"; if a detainee is either a "non-moving resister" or cooperative, OC spray should not be used. Ms. Parks described a moving resister as a detainee who is "moving to avoid the officer trying to gain physical control" of him.

¶ 10    Ms. Parks testified that as she watched the video of the incident, when Officer Vukmarkaj

had his arm around the chest and neck area of Mr. Heard, she would have classified Mr. Heard as "a cooperative subject with the need of direction." She classified Mr. Heard this way because he was "not resisting the officers' effort to gain control of him" or "pulling away" like a moving resister and was not using evasive tactics or movements. But Ms. Parks would not have classified Mr. Heard as being totally cooperative either because it was "partially due to Officer Vukmarkaj's physical restraint of his person across the chest that he has kind of deescalated."

¶ 11     Ms. Parks testified that Mr. Heard's classification did not change at the time he was sprayed with OC spray, but that the proper force with a cooperative subject would have been "verbal persuasion or officer presence." For a nonmoving resister, the proper use of force would have been "holding, which is [what was] occurring; and it also says some control, equipment or control weapons, which would be more than likely handcuffing."

¶ 12     Officer Leka Vukmarkaj testified that he was working in the intake area when Mr. Heard was "going through." The officer heard a verbal exchange between Officer Cruz and Mr. Heard. Officer Vukmarkaj stated that he began walking toward that "verbal commotion." As he did so, Officer Vukmarkaj saw Mr. Heard "get into a close proximity" of Officer Cruz. From his perspective, it appeared that Mr. Heard made contact with Officer Cruz, chest to chest. Officer Vukmarkaj further stated:

> "As the words were being exchanged between the officer and the inmate, seeing that the inmate seemed agitated, I had physically intervened by pulling the inmate away from Officer Cruz. As that was going on, inmate Heard was trying to resist my movement, my effort to [bring] him away from the officer, the inmate was trying to go— like aggress towards the officer as I was trying to bring him backwards."

¶ 13     As Officer Vukmarkaj was walking Mr. Heard backwards, Mr. Heard was trying to resist

by stiffening his upper body. "As I was trying to restrain him backwards to pull him away from the officer, as he was tensing in that manner, he was trying to go forward, so against my efforts to remove him from the officer." The stiffening of the body is not a characteristic of a cooperative subject because "it was used as an effort to defeat [Officer Vukmarkaj's] attempt and is also seen as a sign of aggression in the jail." Officer Vukmarkaj testified that Mr. Heard was "[n]ot so much [going] forward as to try to not necessarily go with my attempt to pull him backwards."

¶ 14    Officer Vukmarkaj testified that he did not recall if he initially gave any orders to Mr. Heard, but after refreshing his memory, Officer Vukmarkaj testified that he reported that he had ordered Mr. Heard to go back to the bullpen. Mr. Heard ignored Officer Vukmarkaj, then Officer Cruz ordered Mr. Heard to go back to the bullpen. During the OPR interview, Officer Vukmarkaj testified, he said he had worked with Officer Cruz, that Officer Cruz was a knowledgeable officer and well-received by their peers, that he was a "stable person, like a rounded person." Mr. Heard stopped resisting once the OC spray was deployed. Officer Vukmarkaj did not consider Mr. Heard as compliant before the OC spray was deployed.

¶ 15    Lieutenant Adam Thielen testified that he did not remember the incident between Mr. Heard and Officers Cruz and Vukmarkaj. Lieutenant Thielen also testified that Officer Cruz was not a difficult officer to supervise, he was never insubordinate in any way, and Lieutenant Thielen never witnessed Officer Cruz use excessive force.

¶ 16    Officer Steven Cruz testified that he had been employed as a correctional officer from 2006 until July 2015. He had never been disciplined for excessive force or misconduct and had never been involved in any use of force. Officer Cruz testified about an incident that occurred with an inmate in May 2010. The inmate was agitated and grabbed Officer Cruz by the neck,

then pushed Officer Cruz down. Officer Cruz "took a blow to the head." Officer Cruz testified that, as a result, he was in the intensive care unit for several days and suffered swelling and bruising of the brain. Officer Cruz was off of work for several months and was diagnosed with PTSD, so he was recommended to not have any inmate contact and was sent to a psychiatrist. Officer Cruz testified that he returned to the workplace either at the end of 2010 or the beginning of 2011, and brought the recommendation of no inmate contact to his sergeant and lieutenant on several occasions. "Nothing was done. I got to a point where I just stopped asking and just—just did my job."

¶ 17    Officer Cruz testified that he was familiar with the Desmedt Use of Force Model. On January 13, 2012, Officer Cruz testified that he kept hearing officers order Mr. Heard to the bullpen, and Mr. Heard was "already agitated." Officer Cruz testified that he then stepped out to direct Mr. Heard to the bullpen. He stated that Mr. Heard apparently "didn't like that *** and he spat out some words like *** '[s]hut the f*** up, b****.' " Officer Cruz then approached Mr. Heard to walk him to the bullpen. When Officer Cruz approached, Mr. Heard bumped the officer with his chest. Officer Cruz testified that in response he pushed Mr. Heard "to keep his distance from me. And he just kept going at the mouth, and I kept telling him, Sir, relax, relax, you're going to get sprayed, you're going to get sprayed, and he just didn't want to hear it." Mr. Heard then tried to go around Officer Cruz on Officer Cruz's left, and Officer Cruz tried to prevent him from going that direction:

> "I was trying to prevent him to go to the left side because there was a machine there and there's nowhere from him to go. And from past experience I got scared and thought he was going to hit me or do something to me, so I pushed him back again trying to get him to go to my right, because I knew there was two officers, Vukmarkaj and Peck, standing

behind, and sure enough when I pushed him over back is when he started coming at me again and then that's when Vukmarkaj pulled him away."

¶ 18    When Officer Cruz pushed Mr. Heard "to get him away from going to the left," Mr. Heard "came back at" Officer Cruz, which is when Officer Vukmarkaj grabbed Mr. Heard across the shoulder and pulled Mr. Heard back. As Officer Vukmarkaj had Mr. Heard across the shoulder, Mr. Heard was "still struggling, trying to get out of his grip." Officer Cruz told Mr. Heard to "quit resisting, I'm going to spray you, quit resisting." Officer Cruz then deployed the OC spray because "all [Mr. Heard] wanted to do was fight, so by spraying him we got control of the situation." Officer Cruz testified that at the time of the first and second push, he classified Mr. Heard as a moving resister, and at the time Officer Cruz deployed the OC spray, Mr. Heard was still resisting and still would have been classified as a moving resister. Officer Cruz stated that OC spray is permissible for use against a moving resister and that he had issued several warnings that Mr. Heard was going to be sprayed.

¶ 19    The first time Officer Cruz knew he was being accused of excessive force was when he was called in for an interview with OPR on March 10, 2014. Officer Cruz testified that when he signed his initial reports and when he gave his statement to OPR, he did not intentionally leave anything out. He also testified that when he engaged in the use of force against Mr. Heard, his actions were not intended to retaliate against Mr. Heard and were not intended to be punitive. Officer Cruz believed his actions were reasonably necessary to achieve lawful objectives and in compliance with the Sheriff's order on response to resistance and use of force.

¶ 20                    B. The Merit Board's Decision

¶ 21    The Merit Board issued its decision on May 2, 2016, finding that Officer Cruz "had an opportunity to deescalate the situation," that no evidence showed Officer Vukmarkaj "had any

type of struggle to walk [Mr. Heard] away," and that Officer Vukmarkaj was "in control of [Mr. Heard] when Officer Cruz sprayed him with OC spray." The Board concluded, based on the evidence presented and "after assessing the credibility of witnesses," that Officer Cruz violated the rules and regulations of the Cook County Sheriff's Office and the Merit Board, article X, paragraph B. "Wherefore, based on the foregoing, it is hereby ordered that the Sheriff's request to terminate and remove Steven Cruz *** is granted effective July 30, 2014."

¶ 22                                C. Circuit Court Proceedings

¶ 23    On May 23, 2016, Officer Cruz filed his complaint for administrative review of the decision to terminate him in the circuit court. Officer Cruz alleged that the Merit Board's decision was against the manifest weight of the evidence and clearly erroneous, violated due process and the Illinois Uniform Peace Officers' Disciplinary Act, and that "the discipline imposed [wa]s arbitrary and capricious, unrelated to the requirements of the service, [wa]s based on trivial allegations, and [did] not constitute sufficient cause for termination." Officer Cruz also argued that the Board's decision was untimely and should be otherwise barred by the doctrine of *laches*. He requested the circuit court vacate the Board's decision to terminate him. The circuit court affirmed the Board's decision.

¶ 24                                II. JURISDICTION

¶ 25    The circuit court affirmed the decision of the Merit Board on March 22, 2017. Officer Cruz filed a timely notice of appeal from that decision on April 6, 2017. This court has jurisdiction over this appeal pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. Jan. 1, 2015), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 26                                    III. ANALYSIS

¶ 27                          A. The Constitution of the Merit Board

¶ 28    Officer Cruz first contends that the decision of the Merit Board is void because the Board was illegally constituted at the time it granted the Sheriff's request to terminate him. Officer Cruz, relying on our recent decision in *Taylor v. Dart*, 2017 IL App (1st) 143684-B, contends that because three members of the Board—Kim Widup, Patrick Brady, and Gary Mateo-Harris—were all appointed by the Sheriff to interim terms of less than six years, the Board was improperly constituted, and therefore his termination is void. In response, defendants argue that the Merit Board's decision is not void both because the *de facto* officer doctrine applies and because a December 2017 amendment to section 3-7002 of the Counties Code (55 ILCS 5/3-7002 (West 2016)) retroactively allows the Sheriff to make appointments to terms shorter than six years.

¶ 29    At the time Officer Cruz's termination was being considered by the Merit Board, section 3-7002 of the Counties Code provided:

> "There is created the Cook County Sheriff's Merit Board, hereinafter called the Board, consisting of *** 7 members appointed by the Sheriff with the advice and consent of three-fifths of the county board, except that the Sheriff may appoint 2 additional members, with the advice and consent of three-fifths of the county board, at his or her discretion. ***
>
> Upon the expiration of the terms of office of those first appointed *** their respective successors shall be appointed to hold office from the third Monday in March of the year of their respective appointments for a term of 6 years and until their successors are appointed and qualified for a like term." 55

ILCS 5/3-7002 (West 2016).

¶ 30    On May 12, 2017, this court issued its opinion in *Taylor*, which was an appeal pursuant to Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010), for the purpose of answering two certified questions: (1) whether the appointment of an individual to the Merit Board to less than a six-year term was a valid appointment and (2) if the Merit Board member was not lawfully appointed, whether the Board's decision was rendered void as a result. *Taylor*, 2017 IL App (1st) 143684-B, ¶¶ 1, 20, 38. We held that an appointment of less than six years was not valid and that a decision of the Board made with a member who had been appointed to a terms of less than six years was void. *Id.* ¶¶ 2, 37, 46. We noted that the plain language of section 3-7002 gave individuals appointed to the Board the "right to be appointed to a full six-year term" and concluded that the statute did not authorize the Sheriff "either explicitly or by implication to appoint an individual to the Merit Board for less than a six-year term." *Id.* ¶¶ 23, 37. John R. Rosales, the Board member whose appointment was at issue in *Taylor*, had been appointed to less than a six-year term and then had continued to serve after his term expired. *Id.* ¶ 8.

¶ 31    After our decision in *Taylor* was issued, the legislature amended the statute to specifically authorize interim appointments by the Sheriff, effective December 8, 2017. Public Act 100-562 added the following to section 3-7002 of the Counties Code:

> "Each member of the Board shall hold office until his or her successor is appointed and qualified.
>
> In the case of a vacancy in the office of a member prior to the conclusion of the member's term, the Sheriff shall, with the advice and consent of three-fifths of the county board, appoint a person to serve for the remainder of the unexpired term." Pub. Act 100-562, § 5 (eff. Dec. 8, 2017).

¶ 32    On September 28, 2018, this court issued the decision in *Lopez v. Dart*, 2018 IL App (1st) 170733. In that case, we considered arguments similar to those that Officer Cruz makes here and found that the *de facto* officer doctrine applied and that, therefore, the illegally-appointed Board member in that case—John R. Rosales, the same Board member whose appointment was successfully challenged in *Taylor*—did not provide grounds for invalidating the Board's termination decision. We agree with the careful reasoning of the court in *Lopez* and find that the *de facto* officer doctrine also controls the outcome of this case.

¶ 33    As a preliminary matter, we address two issues raised by the Sheriff that he claims make it unnecessary for us to reach the *de facto* officer doctrine. The Sheriff argues, first, that Officer Cruz has forfeited this issue and, second, that Officer Cruz has not provided an adequate record on appeal from which we can address it. We reject both of these arguments.

¶ 34    It is quite true that Officer Cruz never raised this issue before the Merit Board in 2016 or before the circuit court in 2017, although he had ample opportunity to do so. But, as the court held in *Lopez*, forfeiture serves as a limit on the parties, not on the court. *Id.* ¶ 39. We agree that it is appropriate for us to reach this issue, which goes to the validity of the Board's decision, in order to maintain a uniform body of law and because the interests of justice so require. *Id.*

¶ 35    In reference to the record on appeal, the Sheriff notes that a different panel of this court denied a motion filed by Officer Cruz several months ago to supplement the record on appeal with the appointment records, from the Sheriff's website, for two of the commissioners whose appointments Officer Cruz is contending were invalid. On our own motion, prior to argument in this case, we vacated that order and allowed Officer Cruz to supplement the record on appeal with these appointment records.

¶ 36    Having determined that this issue is properly before us, we must decide whether the

appointment of members to less than six-year terms renders the Board's termination decision in this case void. This was the issue before the court in *Lopez*. There, we traced the history of the *de facto* officer doctrine back to its roots in the 15th century. *Id.* ¶ 48. We noted that, originally, the doctrine prohibited *any* collateral attacks on a government officer's authority or appointment in a proceeding in which that officer presided. *Id.* ¶¶ 48-50. These attacks were considered "collateral" because they sought to challenge the officer's qualifications or appointment in the context of a proceeding challenging a decision that the officer had rendered. Under the *de facto* officer doctrine, an officer's qualifications or appointment had to be attacked "directly" in a *quo warranto* proceeding, which, generally, could only be brought in Illinois by the Attorney General, the State's Attorney, or with leave of court. *Id.* However, because of the "cumbersomeness" of such proceedings, federal courts and, later, our supreme court relaxed the *de facto* officer doctrine to permit a "collateral" challenge to the qualifications of the decision makers in a particular case as a way of challenging the decision that was made in certain limited circumstances. *Id.* ¶¶ 51-53. As we pointed out in *Lopez*, the precise contours of when and where such collateral attacks should be allowed has not been spelled out by our supreme court. *Id.* ¶¶ 54-58. But a careful review of the decisions of that court led us to decide in *Lopez* that application of the *de facto* officer doctrine barred Officer Lopez's challenge to the Board's decision to terminate him on the basis that a member of the Board had not been properly appointed to a six-year term. *Id.* ¶ 58.

¶ 37    In *Lopez*, we relied heavily on what we characterized as the "sound reasoning" of Justice McMorrow in her concurring opinion in *Daniels v. Industrial Comm'n*, 201 Ill. 2d 160, 167 (2002) (McMorrow, J., specially concurring). Justice McMorrow suggested that the court should weigh two competing interests in deciding whether the *de facto* officer doctrine should bar a

challenge: "the public's interest in promoting the orderly functioning of [government]" and the public's interest in exposing "illegal appointment procedures, thereby ensuring that administrative agencies comply with the statutory mandates which govern them." *Id.* at 175. According to Justice McMorrow, this meant that it was proper to permit only the first person to challenge an improper appointment procedure to invalidate the agency's decision because at that point "the public interest in uncovering and addressing illegality is served." *Id.* at 176. We followed that reasoning in upholding Officer Lopez's termination in *Lopez*. We had already decided in *Taylor* that because Mr. Rosales was not appointed to a six-year term, he was not lawfully appointed to the Board. *Taylor*, 2017 IL App (1st) 143684-B, ¶ 37. Since Officer Lopez was "not the first claimant to have brought the illegal appointment of Rosales to light," we concluded that the "public interest [wa]s better served by not invalidating" the Board's decision to terminate Officer Lopez. *Lopez*, 2018 IL App. (1st) 170733, ¶ 59. We noted that this approach would "circumvent the upheaval that would doubtlessly result if we were to invalidate the Merit Board's decision, and invite hundreds of plaintiffs to seek invalidation of all the decisions rendered by the illegally constituted panel during Rosales's unauthorized term." *Id.*

¶ 38 This approach is sound, and we think it also dictates that we reject Officer Cruz's request to invalidate his termination decision on the basis that members of the Merit Board were appointed to terms of less than six years. Officer Cruz correctly points out that he is not challenging Mr. Rosales's appointment, but is instead challenging the appointments of three other members who, like Mr. Rosales, were appointed to terms of less than six years. But this is the same problem with the appointment procedure that was before us in both *Taylor* and *Lopez*. We read Justice McMorrow's concurring opinion as focused on allowing the first challenger of a particular problem to bring that problem to the court's attention. As she put it: "In my view, the

*de facto* officer doctrine should not be employed in such a way that it forecloses judicial review of matters, such as irregularities in appointment procedures, when brought to the attention of the judiciary as a matter of first impression." *Daniels*, 201 Ill. 2d at 176 (McMorrow, J., specially concurring). Officer Cruz is challenging the same "irregularity" in appointment procedures of the Board that has already come to our attention and been addressed.

¶ 39    In addition, any need for relaxing the *de facto* officer doctrine is absent here because the legislature has been made aware of and remedied the problem. After our decision in *Taylor*, the legislature amended the statute to specifically authorize the Sheriff to make interim appointments. See Pub. Act 100-562, § 5 (eff. Dec. 8, 2017). The balancing that Justice McMorrow suggested in *Daniels*, and that we employed in *Lopez*, points squarely in the direction of promoting the "orderly functioning" (*Daniels*, 201 Ill. 2d at 175 (McMorrow, J., specially concurring)) of the Merit Board, rather than invalidating a governmental decision where the irregularity in appointments has been addressed by the legislature.

¶ 40    Finally, we note that any unfairness in having allowed Officer Taylor to challenge his termination by challenging the Merit Board's constitution while denying this same right to Officers Lopez and Cruz may be more theoretical than practical. As the Sheriff points out in this case, even if we had deemed the Board's decision void because of improper appointments, the only remedy would be to remand the case to the Board for a new decision. See *id.* at 167 (majority). Even if we agreed with Officer Cruz that the Board had to reconsider his case because certain members were not properly appointed, this certainly does not mean that Officer Cruz would necessarily be reinstated, which is the relief he is ultimately seeking.

¶ 41    Our application of the *de facto* officer doctrine renders it unnecessary for us to address any retroactive application of the amended statute on Merit Board appointments. We turn,

therefore, to Officer Cruz's remaining arguments for reinstatement.

¶ 42                    B. The Merit Board's Decision

¶ 43    The finding by the Merit Board that Officer Cruz used excessive force was not against the manifest weight of the evidence or clearly erroneous. Review of an administrative agency's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)). When a party appeals from the circuit court's decision on a complaint for administrative review, we review the administrative decision rather than the decision of the circuit court. *Walker v. Dart*, 2015 IL App (1st) 140087, ¶ 34. The standard of review applied depends on whether the question presented is a question of law, a question of fact, or a mixed question of law and fact. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). We review questions of law *de novo* (*id.*), while we defer to an agency's factual findings unless they are against the manifest weight of the evidence (*City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998)). Mixed questions of law and fact are reviewed for clear error. *AFM*, 198 Ill. 2d at 391.

¶ 44    The Board made specific findings of fact that Officer Cruz had the chance to deescalate the situation, that there was no evidence to show that Officer Vukmarkaj struggled to walk Mr. Heard away from Officer Cruz, and that Officer Vukmarkaj was in control of Mr. Heard when Officer Cruz sprayed the OC spray. An administrative agency's conclusions on questions of fact are considered to be *prima facie* true and correct. *City of Belvidere*, 181 Ill. 2d at 204. These factual determinations will therefore only be overturned as against the manifest weight of the evidence if the "opposite conclusion is clearly evident." *Id.*

¶ 45    The Board's conclusions in this case are supported by the record and, in particular, the videotape recording of the incident. The video recording shows Officer Cruz approach Mr.

Heard, push Mr. Heard twice with both hands, then, as Mr. Heard is being dragged away from Officer Cruz by Officer Vukmarkaj, again walk up to Mr. Heard and deploy the OC spray, as the Board noted, "directly into [his] face and eyes," while the inmate remained in a headlock. It was within the Board's province to determine the credibility of the witnesses and the weight to be given to this evidence. *Iwanski v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 184 (1992). Based on our viewing of the video recording, we cannot say that conclusions opposite to the Board's were evident.

¶ 46    Officer Cruz also questions whether the Board properly applied the relevant orders and regulations to the facts. When the fact finder determines the legal effect of a given set of facts, it is a mixed question of law and fact and we review the decision for clear error. *Rodriguez v. Chicago Housing Authority*, 2015 IL App (1st) 142458, ¶ 15. "An administrative agency's finding is clearly erroneous where, after reviewing the entire record, we are left with a definite and firm conviction that a mistake has been made." *Id.*

¶ 47    Sheriff's Order 11.2.4.0 (eff. Sept. 19, 2011) dictates the department policy on the use of OC spray and, in part, provides that the use of OC spray "shall be in accordance with the guidelines and procedures established in the current [Cook County's Sheriff's Office] Response to Resistance Use of Force Policy," and "shall only be used as a control and compliance measure and shall never be used *** for punishment." Sheriff's Order 11.2.1.0 not only dictates that officers are required to use "an amount of force reasonable and necessary based on the totality of the circumstances," it defines a nonmoving resister as someone who "simply tries not to be moved" but does not attempt to flee, while a moving resister is someone who "resists by moving away from the officer(s)."

¶ 48    According to the Use of Force Model, OC spray is not appropriate for either a

cooperative subject who must be directed or for a nonmoving resister. Testimony of both Ms. Parks and Officer Vukmarkaj support the Board's conclusion that Officer Cruz used an inappropriate amount of force against Mr. Heard. Ms. Parks testified that, based on her observation of the video recording, she would have classified Mr. Heard as a "cooperative subject with the need of direction" and that he was not a moving resister because he was not pulling away or resisting Officer Vukmarkaj's effort to gain control of him. Although Officer Vukmarkaj testified that Mr. Heard attempted to resist his effort to pull him away from Officer Cruz and was "trying to go forward, so against my efforts to remove him from the officer," he also testified that Mr. Heard was "[n]ot so much [going] forward as to try to not necessarily go with my attempt to pull him backward" and that Mr. Heard "stiffened his body and did not willingly go backwards with me as I was attempting to pull him away." The only testimony that supported a finding that Mr. Heard was a moving resister was the self-serving testimony of Officer Cruz himself, which the Board was entitled to disregard. *Iwanski*, 232 Ill. App. 3d at 184.

¶ 49    Officer Cruz makes much of the fact that Ms. Parks was not the lead investigator on the case and did not have training in deploying OC spray. We note that although Ms. Parks was not the lead investigator on the case, she did participate in the investigation and sat in on the OPR interview with Officer Cruz. In addition, Ms. Parks testified that she had been involved in at least 100 use-of-force investigations and at least 30 investigations involving the use of OC spray. Officer Cruz's challenges really go to the weight of Ms. Parks's testimony, which, again, was in the province of the Board to consider. As we have noted in the past: "It is not the function of *** the appellate court in review of administrative proceedings to reweigh evidence or assess credibility of witnesses." *Bultas v. Board of Fire & Police Commissioners*, 171 Ill. App. 3d 189, 195 (1988).

¶ 50    Officer Cruz also argues that the Board applied the incorrect standard when it found that Officer Cruz had an opportunity to deescalate during the incident with Mr. Heard. Officer Cruz argues, in part, that "reference to 'de-escalation' is wholly absent from [the] Sheriff's Order on Use of Force." But, as the Sheriff notes, the guidelines to the use of force policy state that when force is used, "officers shall escalate or de-escalate their use of force based on the subject's resistance."

¶ 51    In short, we find no basis for overturning the factual findings of the Board on the excessive use of force. They are not against the manifest weight of the evidence nor are they clearly erroneous.

¶ 52                            C. *Laches*

¶ 53    Officer Cruz argues that the doctrine of *laches* should be applied to invalidate the Merit Board's decision because the hearing process was so delayed that he was deprived of due process. The timing in this case is undisputed: the incident occurred in January 2012, Officer Cruz was interviewed about the incident in March 2014, the Sheriff filed his complaint before the Board in August 2014, the hearing occurred in February 2016, and the Board issued its decision in May 2016.

¶ 54    "Generally, principles of *laches* are applied when a party's failure to timely assert a right has caused prejudice to the adverse party." *Van Milligan v. Board of Fire & Police Commissioners*, 158 Ill. 2d 85, 89 (1994). "The two fundamental elements of *laches* are lack of due diligence by the party asserting the claim and prejudice to the opposing party." *Id.* Notably, however:

> "There is considerable reluctance to impose the doctrine of *laches* to the actions of public
> entities unless unusual or extraordinary circumstances are shown. [Citation.] This is so

because *laches* 'may impair the functioning of the [governmental body] in the discharge of its government functions, and *** valuable public interests may be jeopardized or lost by the negligence, mistakes, or inattention of public officials.' " *Id.* at 90-91 (quoting *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 447-48 (1966)).

¶ 55    The burden of showing that *laches* applies is on the party asserting the doctrine. See *La Salle National Bank v. Dubin Residential Communities Corp.*, 337 Ill. App. 3d 345, 351 (2003). Here, not only has Officer Cruz not shown the unusual or extraordinary circumstances generally required to apply the doctrine of *laches* to the decision of a public entity such as the Board, but he has also failed to show any definitive prejudice due to the timing of the hearing. Because Officer Cruz failed to meet his burden, we will not apply the doctrine of *laches* here. However, as we discuss further below, we find that, in addition to other considerations, the delay militates in favor of reconsideration by the Board of whether termination was the appropriate discipline in Officer Cruz's case.

¶ 56                              D. Cause for Termination

¶ 57    On review of an administrative agency's decision to discharge an employee, the scope of our review involves a two-step process: first, we determine whether the agency's findings of fact are contrary to the manifest weight of the evidence, and then we determine whether the agency's findings of fact provide a sufficient basis for its conclusion that there was cause for the discharge. *Marzano v. Cook County Sheriff's Merit Board*, 396 Ill. App. 3d 442, 446 (2009). Officer Cruz argues that the Merit Board's decision to terminate him from his employment as a correctional officer was arbitrary, unreasonable, and unduly harsh.

¶ 58    Our supreme court has defined cause as " 'some substantial shortcoming which renders [the employee's] continuance in his office or employment in some way detrimental to the

discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his not longer occupying the place.' " *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 105 (1983) (quoting *Fantozzi v. Board of Fire & Police Commissioners*, 27 Ill. 2d 357, 360 (1963)). An agency's finding of cause to discharge an employee "is to be overturned only if it is arbitrary and unreasonable or unrelated to the requirements of the service." *Id.* at 105.

¶ 59     We have recognized that "violation of a single rule may constitute a sufficient basis for discharge." *Cruz v. Cook County Sheriff's Merit Board*, 394 Ill. App. 3d 337, 342 (2009). Use of excessive force is serious, and this court has upheld the discharge of a police officer for use of excessive force despite his lack of any previous discipline. *Bultas*, 171 Ill. App. 3d at 196. As this court recognized in *Department of Central Management Services v. American Federation of State, County & Municipal Employees (AFSCME), AFL-CIO*, 197 Ill. App. 3d 503, 514 (1990), "[a] clear public policy exists under the law not to batter prisoners" and "[p]ublic policy demands that prison authorities have the power to discharge those engaging in such activities."

¶ 60     However, in this case the Board decision contained no findings that specifically support "cause" for Officer Cruz's termination. There was no finding by the Board that Officer Cruz's continued employment was detrimental to the CCDOC or of any other reason that termination was necessary for the "discipline or efficiency" of the Sheriff's office. The Board's decision simply said, without comment or explanation, that the Sheriff's request to terminate was "granted." We remand this case to the Board so that it can give full consideration as to the appropriate sanction, in light of the facts in this case, which include the following:

>           The videotape recording timer makes clear that the entire incident took 23
>      seconds. As Officer Cruz testified, he had no time to "pause and think" during

those 23 seconds.

This incident occurred in January 2012 and Officer Cruz continued to work for the CCDOC with no mention of the incident until March 2014, when he was first questioned about it. Although, as we have found, this delay does not bar the Sheriff from disciplining Officer Cruz on the basis of *laches*, the fact that the incident was not even investigated for over two years undermines any assumption that it was serious enough to constitute "cause" for termination.

Officer Cruz was attacked by a prisoner in May 2010, resulting in his suffering severe injuries, spending several days in intensive care, and later being diagnosed with PTSD and given a recommendation of no inmate contact. Even if this history does not excuse Officer Cruz's improper use of OC spray to subdue a prisoner, it certainly could mitigate the incident.

Although the Sheriff's complaint alleged that Officer Cruz had filed false reports, there was no finding by the Board that this allegation was supported by any evidence.

Officer Cruz had no disciplinary history and no other record of having used force during the approximately nine years he worked at the CCDOC.

¶ 61 We have recognized that where, as here, we question the sanction that an administrative agency has imposed, our role is to remand the case so that the agency can address our concerns and consider the broad range of disciplinary options, which include reinstatement with or without back pay. *Obasi v. Department of Professional Regulation*, 266 Ill. App. 3d 693, 704 (1994) ("If the reviewing court finds that the sanction is unreasonable, it cannot modify the sanction; rather, the court must remand to the agency for further proceedings consistent with the court's expressed

opinion."). We do so in this case.

¶ 62                                   IV. CONCLUSION

¶ 63    For the foregoing reasons, the factual finding of the Merit Board that Officer Cruz used excessive force is affirmed. However, we remand the case for reconsideration of whether there was cause to terminate him from the CCDOC.

¶ 64    Affirmed in part and remanded with directions.