2022 IL App (1st) 210118-U

No. 1-21-0118

Order filed September 8, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| YASMINA VAVAL and TERESA FOSTER, | ) | Appeal from the Circuit Court of Cook County. |
| Petitioners-Appellants, | ) | |
| v. | ) | |
| THE POLICE BOARD OF THE CITY OF CHICAGO and SUPERINTENDENT OF POLICE EDDIE JOHNSON | ) | No. 19 CH 11251 |
| Respondents, | ) | |
| (Former Superintendent of Police Eddie Johnson, Respondent-Appellee). | ) | Honorable Raymond W. Mitchell, Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justices Reyes and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's order affirming the Police Board of the City of Chicago's decision to terminate petitioners Yasmina Vaval and Teresa Foster's employment. The Chicago Police Board's decision is affirmed, where there was ample evidence supporting its factual findings, which were not against the manifest weight of the evidence.

¶ 2    Petitioners, Yasmina Vaval and Teresa Foster, appeal from a January 5, 2021 order of the circuit court of Cook County affirming the City of Chicago Police Board's (Board) August 22, 2019 final administrative decision that ordered petitioners discharged from their positions as police officers for the City of Chicago. For the following reasons, we affirm the circuit court's order affirming petitioners' terminations.[1]

¶ 3                                    I. JURISDICTION

¶ 4    On August 22, 2019, the Board issued its decision finding petitioners guilty of violating various Rules of Conduct and discharging them from their positions as police officers. Petitioners filed a complaint for administrative review, and the circuit court affirmed the Board's discharge order on January 5, 2021. Petitioners filed a timely notice of appeal thereafter on February 3, 2021. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1980, art. VI, § 6) and Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303(a) (eff. July 1, 2017), governing appeals from a final judgment of a circuit court in a civil case.

¶ 5                                    II. BACKGROUND

¶ 6    Vaval was sworn in as a Chicago police officer on September 11, 2000. Foster was sworn in as a Chicago police officer on December 18, 2000 and went on disability leave in 2010. Vaval and Foster have been domestic partners since approximately 2007 and are now married. Vaval and Foster lived together with Foster's two biological children, Sean and Trayvon (Darrien). D.V., M.V., and C.V. first came to live with Vaval as foster children in November and December of 2007.[2] Vaval adopted the children in February 2009, and the Department of Child and Family Services (DCFS) removed the children from their physical custody in November 2009.

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.
[2]We use initials to protect the minors' anonymity.

¶ 7                             A. Charges Against Yasmina Vaval

¶ 8        On January 3, 2019, the Superintendent of Police (Superintendent) filed charges against Vaval, alleging, in seven counts, that she had committed the following five Department rules of conduct violations:

> "Rule 1: Violation of any law or ordinance.
>
> Rule 2: Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.
>
> Rule 3: Any failure to promote the Department's efforts to implement its policy or accomplish its goals.
>
> Rule 8: Disrespect to or maltreatment of any person, while on or off duty.
>
> Rule 14: Making a false report, written or oral."

¶ 9        Specifically, the Superintendent asserted that: (1) in approximately June or July 2008, Vaval learned that her foster son, M.V., suffered an injury, which turned out to be a fracture to the child's orbital bone under the child's left eye, but failed to seek medical treatment for that injury in a timely manner, in violation of Rules 1, 2, 3, and 8; (2) on or about April 29, 2009, Vaval physically maltreated and/or failed to protect from harm her adopted child, M.V., who was physically punished by either Vaval and/or Foster, in a manner resulting in visible physical injuries that necessitated medical care, in violation of Rules 1, 2, 3, and 8; (3) on or about April 29, 2009, M.V. was physically maltreated by Vaval and/or Foster, resulting in visible physical injuries that necessitated medical care, but Vaval failed to seek medical care for the child's injuries until on or about May 1, 2009, in violation of Rules 1, 2, 3, and 8; (4) on or about October 2009, Vaval observed her adopted child, M.V., suffer what appeared to be a seizure, and failed to seek medical treatment, in violation of Rules 1, 2, 3, and 8; (5) on or about October 2009, Vaval physically

maltreated and/or failed to protect her adopted child, M.V., by failing to administer to him prescribed medication, in violation of Rules 1, 2, 3, and 8;[3] (6) on or about November 13, 2009, M.V. was physically abused by Foster, resulting in bruising and/or swelling to various parts of the child's body and/or a broken left arm, but Vaval failed to seek medical care for the child's injuries until on or about November 15, 2009, in violation of Rules 1, 2, 3, and 8; and (7) on or about November 15, 2009, Vaval made a false and/or misleading statement when she told medical personnel treating M.V. that the child's injuries, including bruising on M.V.'s arms and legs and a broken arm, were self-inflicted, in violation of Rules 2 and 14.

¶ 10                                    B. Charges Against Teresa Foster

¶ 11            Also on January 3, 2019, the Superintendent filed charges against Foster, alleging, in five counts, that she had committed the same five Department rules of conduct violations:

> "Rule 1: Violation of any law or ordinance.
>
> Rule 2: Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.
>
> Rule 3: Any failure to promote the Department's efforts to implement its policy or accomplish its goals.
>
> Rule 8: Disrespect to or maltreatment of any person, while on or off duty.
>
> Rule 14: Making a false report, written or oral."

¶ 12            Specifically, the Superintendent asserted that: (1) on or about April 29, 2009, Foster physically maltreated and/or failed to protect from harm, M.V., who was physically punished by either Vaval or Foster, in a manner resulting in visible physical injuries that necessitated medical care, in violation of Rules 1, 2, 3, and 8; (2) on or about November 13, 2009, Foster physically

---

[3]The Superintendent withdrew this charge at the hearing before the Board.

maltreated M.V. in a manner resulting in visible physical injuries that necessitated medical care, in violation of Rules 1, 2, and 8; (3) on or about November 13, 2009 and November 17, 2009, Foster made false and/or misleading statements during interviews with Chicago Police Department (CPD) Detective Thomas Cleary when she denied inflicting any injuries on M.V., in violation of Rules 2 and 14;[4] and (4) on or about December 11, 2009, Foster made a false and/or misleading statement during an interview with CPD Detective Nicholas Cikulin when she denied hitting M.V. with a bat or a brush, in violation of Rules 2 and 14.

¶ 13                                    C. Hearing Before the Board

¶ 14        On June 18, 19, and 26, 2019, a hearing was held on the Superintendent's charges. The following evidence was presented to Hearing Officer Thomas E. Johnson.

¶ 15        First, Vaval was called as an adverse witness. Vaval testified that, in November and December 2007, three children—D.V., M.V., and C.V.—came to live with her and Foster, as foster children. Thereafter, Vaval officially adopted the three children in February 2009. Vaval admitted that, in 2009, DCFS conducted three separate investigations regarding suspicious injuries that were suffered by either D.V. or M.V. The first investigation was initiated by DCFS in February 2009 and involved injuries suffered by D.V. The second and third investigations were initiated by DCFS in April 2009 and November 2009, respectively, and involved injuries suffered by M.V.

¶ 16        Prior to these investigations, when M.V. was seven years old, there was an incident in which M.V. needed medical treatment for his left eye, which stayed stationary upon M.V.'s attempts to look upwards. Vaval was unaware of this problem when M.V. first came to live with her; she only became aware of the injury roughly four months later, in March or April 2008. Approximately four months after learning of the injury, Vaval took M.V. to a doctor regarding the

_____

[4]At the hearing before the Board, this charge was amended to reflect that the November 17, 2009 interview was with Detective Nicholas Cikulin.

problem with his left eye. This doctor subsequently referred M.V. to a surgeon at the University of Chicago Comer Children's Hospital (Comer). Vaval advised both doctors that she believed M.V. had caused the problem by rubbing his left eye. Vaval later learned from the doctors at Comer that M.V. had suffered a fracture of the orbital floor.[5] In November 2008, M.V. underwent surgery on his left eye. However, the surgeon informed Vaval that there was a possibility the eye would have limited mobility due to the delay in seeking treatment. Ultimately, the surgery was unsuccessful.

¶ 17    DCFS's first investigation into Vaval's treatment of her adopted children was conducted pursuant to a hotline call DCFS received on February 24, 2009, regarding D.V. DCFS's second investigation was conducted after Debra Lomax, a social worker at Harold Washington Elementary, made a DCFS hotline call on April 30, 2009, after observing concerning injuries on M.V. That evening, when Vaval arrived home from work, she noted that M.V. had bruises on the back of his legs, knees, and elbows, and an injury to his shoulder. Vaval testified it was her understanding that M.V. initially told Lomax that his mother had hit him on his hands with a belt. The preceding day, April 29, 2009, Vaval and Foster were both home with M.V. until approximately 9 or 9:30 p.m., when Foster left for her overnight work shift. At DCFS's recommendation, Vaval brought M.V. to Comer on May 1, 2009, where he was examined. She informed medical personnel at the hospital that she believed M.V. had caused the injuries to himself, and that he had a history of hurting himself. Specifically, she informed the doctors that he

---

[5]As defined by the American Academy of Ophthalmology, an orbital floor fracture "is when a blow or trauma to the orbital rim pushes the bones back, causing the bones of the eye socket floor [to buckle] downward. This fracture can also affect the muscles and nerves around the eye, keeping it from moving properly and feeling normal." Kierstan Boyd, reviewed by Philip R. Rizzuto, M.D., *What is an Orbital Fracture?*, American Academy of Ophthalmology (Sep. 28, 2017), https://www.aao.org/eye-health/diseases/what-is-orbital-fracture#:~:text=Orbital%20floor%20fracture,moving%20properly%20and%20feeling%20normal (last visited Aug. 23, 2022).

sucked on his arms and rubbed his legs on the rail of his bed to cause the bruises to his arms and legs. Vaval was unaware that M.V. had conveyed to hospital medical staff that he was afraid to lie about his injuries because he was told if he lied, the police would take him away and put him in jail.

¶ 18      DCFS investigator Barbara Williams was assigned to M.V.'s case. Vaval admitted she informed Williams that she had "spanked" M.V. with his belt on his bottom, while he was clothed. However, she denied telling Williams that she "whipped" M.V. on his hands with a belt for acting out in school and testified Williams was incorrect when she included that statement in her report. At the conclusion of the April 2009 investigation, Williams notified Vaval that she was recommending the case be closed as unfounded. Vaval denied that Williams advised her that her explanation for M.V.'s injuries was suspect. Vaval conceded that Williams informed her that if there was another incident involving the children becoming injured, in which the explanation for the injuries was again suspect, that it would be obvious to DCFS that something else had occurred.

¶ 19      Vaval further testified that there was an incident in early November 2009 when M.V. "fake[d] he was passed out." She denied telling medical personnel that M.V. had passed out and instead insisted she only told them that M.V. "be faking." Vaval further stated she did not recall telling doctors at La Rabida hospital that M.V. had hit his head on a countertop so hard that he had passed out, and she assumed that the medical staff "made it up." She further denied telling medical personnel at La Rabida that M.V. had suffered seizure-like symptoms—foaming at the mouth, eyes rolling back into his head with clonic jerking—in October 2009. She clarified that she informed the medical staff that "he was shaking like he was having a seizure, but not a seizure." She alleged that the medical personnel also "made up" the information regarding M.V.'s seizure. Despite

admitting that she had never seen M.V. "shake" before, she failed to seek any medical attention for M.V. following his October 2009 symptoms.

¶ 20    DCFS's third investigation was conducted after an employee at M.V.'s school called the DCFS hotline on November 13, 2009. When Vaval arrived home from work that evening, she was met by two DCFS investigators—Venus Cole and Jacque Butler. While the investigators were present, Vaval had M.V remove his shirt. Vaval observed injuries on his back, including bruises and linear marks on his shoulders, hip, and thighs, and an injured forearm. She denied seeing linear marks and bruising on his right buttocks. Vaval testified that the evening of November 13 was the first time she noticed M.V.'s injuries. Investigator Cole directed Vaval to take M.V. to the hospital to be assessed. On the evening of November 14, 2009, Vaval brought M.V. to Hartgrove Hospital[6] but medical personnel there told her she needed to take M.V. to another hospital for a neuropsychological evaluation and a physical examination. Vaval then took M.V. to La Rabida hospital at approximately 1 a.m. on November 15, 2009. The hospital admitted M.V., and Vaval returned home. Later that day, Vaval returned to the hospital and M.V. was examined by a physician, Doctor Ziemianin.

¶ 21    Vaval further testified she informed the doctor at La Rabida that M.V. had a history of hurting himself and she believed that M.V. had caused his own injuries. On November 16, Foster returned to La Rabida and apprised Doctor Ruby Roy, who was attending to M.V.'s injuries, that M.V. had hurt himself. Within several days of the start of the November 2009 DCFS investigation, C.V. and D.V. were removed from Vaval's home, and were placed with Vaval's sister, Jocelyne. M.V. remained admitted to La Rabida.

---

[6]As evinced during Vaval's testimony, Hartgrove Hospital is primarily a psychological hospital, although it does operate a small medical clinic.

¶ 22    Based on the assessments made at La Rabida, DCFS instituted proceedings in juvenile court to remove D.V., M.V., and C.V. from Vaval's care and custody. Following hearings and testimony, the court found that M.V. had been physically abused and that all three children had been neglected and were living in an injurious environment. Vaval admitted that M.V. suffered from fetal alcohol syndrome, had cognitive disabilities, and was physically underdeveloped. She further acknowledged that, as M.V.'s custodial parent, it was her job to protect him.

¶ 23    On cross-examination, Vaval testified that, prior to fostering the children, she filled out an application, was interviewed by Lutheran Children and Family Services (LCFS), and took a specialized class regarding how to care for children in DCFS care. D.V., M.V., and C.V. were all categorized as needing specialized care. Vaval stated she was only interested in fostering children who were up for adoption because she loves children and "wanted to take care of them." Despite Foster living with Vaval, LCFS never interviewed nor screened Foster when evaluating Vaval as a potential foster or adoptive parent. Foster was responsible for dropping the children off at school in the morning and picking them up after school.

¶ 24    Vaval explained she believed that M.V.'s behavior was "unusual" as soon as the children were brought to Vaval's house, when M.V. said "[a]re you going to be my new mommy?" and then began looking around the house with D.V. Vaval further noted that during timeouts, M.V. would "put his leg over the bunk bed top rail and rub it back and forth. And then he'll suck on his arm." Additionally, she stated M.V. once defecated in the kitchen and spread his feces on the kitchen and bathroom walls, claiming D.V. had told him to. Vaval spoke with M.V.'s caseworker, Saneeta Auster, about the incident and Auster recommended play, cognitive, and speech therapies for M.V. Thereafter, M.V. participated in therapy, saw a psychiatrist, and began taking medicine for attention-deficit/hyperactivity disorder (ADHD). Soon afterward, Vaval discovered M.V. was

not taking the medication and had been storing them under his bed. Vaval testified that M.V. was never diagnosed with having seizures and she never observed him have a seizure.

¶ 25 Vaval detailed the procedure for seeking medical treatment for the children when she was fostering them—in an emergency she could take them to the hospital or call 911, but in a non-emergency situation she would have to call the caseworker to come to the house and evaluate the child. The caseworker would then call DCFS and get a referral or consent, and Vaval could then take the child to a doctor. This procedure for medical care continued for the first six months after adoption. Additionally, caseworkers continued to make visits to check on the children during this period, to ensure they had adequate food, bedding, and clothing.

¶ 26 Regarding the first charge against her, Vaval testified she first learned M.V. had an issue with his eye when he came into the living room on April 29, 2008 and expressed he had a "trick" to show her.[7] Vaval then notified caseworker Auster regarding M.V.'s eye "trick," and Auster stated M.V. needed a referral to be seen. M.V. told Vaval he could do the "trick" by rubbing his eye and he never indicated that it was painful to him; rather, he would smile when performing the "trick." After receiving the referral (which Vaval stated took a couple of weeks), Vaval made an appointment with Doctor Griswold at Comer. Upon examining M.V., Griswold told Vaval M.V.'s left eye was "defected," and recommended outpatient surgery. After M.V.'s November 2008 surgery, Griswold revealed that M.V.'s orbital bone was fractured. Vaval denied that either she or Foster had ever struck M.V. in the face or near his eye.

¶ 27 Concerning the second charge against Vaval, she testified that she first became aware of M.V.'s bruises on April 29, 2009 after investigator Williams arrived at her house that day. After

---

[7]During M.V.'s school physical, there was no indication that something was wrong with his eye. At some point after Vaval became M.V.s foster/adoptive mother, although she could not recall when, she took him to see an optometrist and he began wearing glasses.

checking on M.V., Vaval saw two big red bruises, each roughly the size of a baseball, on the back of M.V.'s knees. Williams informed Vaval that this was the second open case DCFS had and, if it happened again, they were going to do further investigation. Williams never spoke to M.V. privately and told Vaval she could wait until the next day to get M.V. evaluated at the hospital. On April 30, 2009, Vaval took M.V. to Comer, where she explained to hospital staff that he "put his leg across the bunk bed rail and going back and forth" caused the redness. M.V. made similar statements that he caused the bruising to his arms by sucking on them and the bruises to his legs by rubbing them on his bunk bed railing. She did not need a referral for him to be seen because there is a different procedure following a call to the DCFS hotline. M.V. was not given any ointment or medicine for his injuries. Vaval denied ever hitting M.V. with her hand, but admitted she used M.V.'s belt to spank his buttocks through his clothing. She further conceded that on April 29, 2009—the same day Williams came to the house—M.V. got in trouble at school, was given detention, and was sent home with a letter for Vaval to sign. Vaval denied disciplining or spanking M.V. on April 28, the day before M.V. received detention for misbehaving.

¶ 28      Vaval denied that she, at any point, witnessed M.V. pass out, foam at the mouth, or observed his eyes roll back in his head. Rather, she testified that D.V. once yelled out to her that M.V. was "faking again," and when she rushed to M.V., she observed him "kind of shaking," but then he jumped up and started laughing. Vaval was familiar with seizures since her nephew suffers from seizures. She further denied telling M.V. that the police would come and put him in jail if he lied about his injuries.

¶ 29      Regarding the charges surrounding the November 2009 events, Vaval stated she never allowed Foster to strike M.V. on November 13, 2009. Vaval was at work when she received a call from D.V. revealing that M.V. had told "Ms. Cole" that Foster hit him with a baseball bat. When

questioned by Vaval, in the presence of Cole and Butler, M.V. denied telling Cole he had been hit with a baseball bat. Vaval had M.V. disrobe, and she observed bruising behind M.V.'s knees and on his arm. Vaval did not notice any swelling on M.V.'s arms and he did not complain that his arm hurt. After M.V. denied being hit by a bat, Cole tore up a service plan she had in her hand and M.V. stood there "smirk[ing]." Cole then informed Vaval that she could take M.V. to Hartgrove or La Rabida. When Vaval asked if she should take M.V. to the hospital that evening, Cole told her no and asked if she was able to take him the next day. Vaval explained that M.V. had a football tournament the next day, and Cole said she could take him after the tournament.

¶ 30       Around 5 or 6 p.m. on November 14, following the football game, Vaval took M.V. and the children home to eat dinner. Later, Vaval took M.V. to Hartgrove, where she explained to the intake nurse that she was there for an evaluation because of M.V.'s self-harm injuries. The nurse gave Vaval a referral for a neuropsychological and physical examination at Chicago Community Mental Health Center (CCMHC), citing a possible seizure M.V. suffered a week prior. Vaval denied telling the nurse anything about M.V.'s physical condition or any event that happened a week prior. Since CCMHC was closed on the weekend, Vaval took M.V. to La Rabida so she could get the evaluation "over with." Once at the hospital, medical personnel made the decision to admit M.V., and Vaval returned home. Vaval denied doing anything around November 13, 2009 to cause physical harm to M.V.

¶ 31       Following the juvenile court proceedings and adjudication, Vaval visited M.V. once at a group home. According to Vaval, she made the ultimate decision not to allow M.V. to move back into her house because she did not want to "[walk] on eggshells" in her own home. On re-direct examination, counsel for the Superintendent presented Vaval with paperwork indicating that the

DCFS hotline call was made on April 30, 2009, and that she brought M.V. to Comer on May 1, 2009.

¶ 32        M.V., who was 18 years old at the time of the hearing, was next called as a witness. M.V. testified that he, along with biological brother D.V., and C.V., lived with Vaval, Foster, Darrien, and Sean for over a year, around 2009. He stopped living with Vaval and Foster when DCFS had him removed because of abuse he suffered. M.V. thereafter went to live with Vaval's sister, Jocelyne. He was currently living in a transitional living program and was about to graduate high school. M.V. could not remember the date that he suffered his eye injury, but remembered it was while he was living with Vaval. He incurred the injury when Foster punched him in the eye. While the injury hurt, he did not tell Vaval or anyone else what happened because he was scared. M.V. denied injuring his eye by rubbing it. He stated that his eye remains stagnant when he tries to look upwards.

¶ 33        M.V. attended Harold Washington Elementary when he lived with Vaval and remembered his case manager at school asking him about bruises on his body. He explained that he received bruises after Foster hit him with wooden sticks and brushes. He did not tell Vaval about the beatings because he was scared that Foster "would do it again." M.V. denied causing the injuries to his arms and legs. When questioned regarding his 2009 broken arm, he explained his arm broke after it became "stuck" in the bunk bed and Foster stepped on it. No one else was in the room when Foster broke his arm, and he did not tell Vaval about it because he was scared. He denied breaking his own arm and stated he never told anybody he broke his arm by hitting it on the desk at school. M.V. further denied hitting himself with a hairbrush or banging his legs on his bunk bed.

¶ 34        On cross-examination, M.V. testified that he takes Abilify for depression, does not have seizures, and does not take medication for seizures. M.V. stated he never told lies about D.V. or

anyone else who lived in the house with him when he lived with Vaval. He testified that if he "know[s] something's happening to me, I ain't going to lie about it." M.V. recollected an instance when he first moved in with Vaval, where he and D.V. were sitting on the bed and Foster came in there and "started whooping [D.V.] for no reason." He testified that neither his teachers nor coaches would check in with him and ask how he was doing. M.V. stated he did not believe Foster walked with a cane or wore braces on her hands while he lived with her. He recalled the incident where his eye was injured and explained he was sitting on the toilet in the bathroom when Foster came in and punched him in his eye "for no reason." He received a black eye from the punch, but nobody questioned him regarding it. M.V. denied rubbing his legs against his bunk bed rail while living with Vaval.

¶ 35    He conceded he told his DCFS caseworker in November 2009 that Foster beat him with a bat and further explained that she beat him with multiple items. He explained that in November 2009, Foster took him downstairs (at what he believed was Foster's mother's residence) and beat him with a bat before dropping him off at school in the morning. M.V. clarified that Foster would first drop off her biological children before dropping off D.V., C.V., and M.V. at Harold Washington Elementary. He stated that sometimes Foster would turn right towards their home instead of heading straight to the school, and he knew that meant she was going to beat them. M.V. was not the only adoptive child that Foster beat. Foster would take them back to the house before school, bring them individually into rooms, and hit them with wooden sticks, their brush, and their belts. M.V. testified this happened daily when they were going to school. He did not tell Vaval because he felt like she knew it was happening and "just didn't care." He admitted Vaval was not present when the beatings occurred, but he assumed she knew because "[Foster and Vaval] talk and stuff." While M.V. at some point stated that Foster did not hit him with a bat, he only said that

because he feared Foster and knew he would have to go back to living with her. M.V. could not remember speaking to police detectives in November 2009 and could not recall telling La Rabida doctors that he broke his arm when he hit it on a desk.

¶ 36        M.V. could not recollect going to the hospital in May 2009 for a bruised back and legs. Neither could he remember getting into trouble at school and receiving a detention, but he stated that he probably received detention because "everybody got a detention" at his school. He likewise could not recall telling his teacher in May that he got "whipped" with a belt as a result of getting in trouble at school nor could he recall telling personnel at the hospital that he caused the bruises himself by sucking on his arm and rubbing his legs on the bed. He denied receiving timeouts for punishment when he lived with Vaval and Foster.

¶ 37        C.V., who was 16 years old at the time of the hearing, testified that Vaval and Foster were his guardians when he was approximately 5 years old. Although C.V. could not remember the exact dates that he lived with Foster and Vaval, he testified that he lived with them for two different periods of time, the second in 2015 or 2016. He stated he stopped living with Vaval and Foster the first time because M.V. and D.V. were being abused.[8] When C.V. was removed from Vaval and Foster's home the second time, he went to Comer. C.V. is no longer in communication with M.V. and did not recall seeing M.V. with marks on his legs or hands when they lived with Vaval and Foster. He stated M.V. never broke his arm and he never saw M.V. hurt himself, hit himself with a hairbrush, or bang his legs against the bunk bed.

¶ 38        On cross-examination, C.V. testified that he remembered sharing a room with M.V. at Vaval's home and did not remember sharing a room with Darrien. On re-direct examination, C.V. clarified that he saw M.V. with a broken arm but that M.V. did not break his own arm. He

---

[8]C.V. admitted that he was "still young back then, so my memory is kind of fuzzy on that."

remembered that M.V.'s broken arm had "something to do with Teresa," but he was "too young" when it happened to say definitively who broke M.V.'s arm. On recross-examination, C.V. stated that Foster used to drive him to school, and he remembers going to Foster's mother's house sometimes before school. He admitted being angry with Vaval and Foster but stated that he does not "hold a grudge." On further re-direct examination, C.V. elaborated that he is angry with them because his shoulders have "big scars on them" from Foster hitting him with a stick.

¶ 39    The parties stipulated that, if Venus Cole were called to testify, she would testify that in November and December of 2009, she worked as a child protection investigator for DCFS. In her role, she investigated allegations of abuse after they were called into the child abuse and neglect hotline (hotline). She would further testify that an investigation was opened on November 13, 2009 based on a hotline call from an individual at M.V.'s school that M.V. had complained his hand was hurting. His palms were observed to be red, and his thumb bruised and swollen. He reported that Foster hit him with a brush and a bat that broke in half. M.V. later recanted these allegations. Cole interviewed M.V. at the school counseling office, where he told her that he got a "whooping" with a brush by Foster. His left arm was swollen, his right arm had bruises that looked like he was scraped, he had a bruise on his left knee, and marks on his back like he was bruised with an object. Cole later learned that M.V. had other bruises on his back area as well. When Cole interviewed D.V. on November 13, 2009, D.V. told her that M.V. hurt himself all the time and he saw him do so. Cole recommended a safety plan be completed and stated that M.V. should be seen by a doctor that day. C.V. reported to DCFS that he observed M.V. being "whipped" by Foster on the day he was injured.

¶ 40    Cole would further testify that when she spoke to Vaval on that same date, Vaval reported she had adopted the children two years earlier and they had experienced numerous behavioral

problems. Cole informed Vaval that the children should be taken to Hartgrove Hospital or Chicago Lakeshore Hospital so they could be assessed for self-mutilation. Cole was informed by Vaval that, on prior occasions, DCFS investigations had been initiated when the children had hurt themselves. When that had occurred, Vaval stated she took them for an evaluation but was not given a diagnosis. Cole gave Vaval a medical referral form that needed to be completed by a doctor to evaluate M.V.'s injuries. Cole also expressed that the children needed psychiatric treatment and/or medications. Cole additionally communicated that she found Vaval to be credible when she explained that M.V. had hurt himself and therefore M.V. could stay with Vaval during the investigation. Also on November 13, 2009, Cole met with Foster, and Foster denied doing anything to M.V. Three days later, Cole met with Sean Foster who stated he had seen M.V. in the bathroom with a brush on his back and had seen M.V. scratching his legs across the bed. When Cole asked Sean if he had seen M.V. get a "whipping," Sean did not respond, but said they are punished by not being allowed to play games or by being sent to bed. Cole did not observe any marks of abuse on Sean.

¶ 41          Doctor Roy informed Cole on November 16, 2009 that M.V. had a fracture through the humerus in his right arm and that she believed M.V. could not have caused the bruises to his back. Dr. Roy additionally wanted to know if DCFS was aware that, the previous year, M.V. had suffered a fracture to his eye socket that required surgery. Cole learned that the children had reported to Vaval that they had been "whipped" by Foster, but Vaval did not believe them. As a result of the November 13 incident, M.V., C.V., and D.V. were removed from the home and were placed in protective custody. The children were taken to a shelter and then eventually placed in the care of Vaval's sister, Jocelyne McGlorthan. The McGlorthan's indicated they were willing to care for the children until the investigation was completed. On November 18, 2009, Cole informed Vaval that

the boys had been placed in protective custody and the case was referred to the juvenile court. Temporary custody over the children was awarded to DCFS. Lastly, Cole would testify that in December 2009, she conducted a risk assessment and prepared a summary report. She determined that M.V. could not be safely maintained in the home with appropriate services and/or a safety plan. She concluded that while the boys may have engaged in questionable conduct, M.V.'s injuries could not have been self-administered.

¶ 42    Jocelyne McGlorthan, Vaval's older sister, was next called as a defense witness. Jocelyne met M.V. when Vaval first brought the children home in 2007. She continued to interact with M.V. several times a week, especially on Sundays. Jocelyne would occasionally pick M.V. up from school if his mothers were unavailable. She never observed M.V. with a black eye and he never told her that Foster was beating him, sat on him, or broke his arm. She never witnessed Vaval or Foster spank or whip M.V., though occasionally he was on punishment and was confined to his bedroom. Jocelyne "quite often" saw M.V. do "unusual" things with his eye, including turn his eyelid inside out. When Jocelyne spoke with her sister regarding why M.V. was removed from her care, Vaval told Jocelyne that it was because Foster had broken M.V.'s arm. Jocelyne never asked Vaval if she hurt the children because Vaval was her sister, and she "knew" Vaval would not hurt them.

¶ 43    After the children were removed from Vaval's care, Jocelyne and her husband, Derek McGlorthan, agreed to house the children. M.V. stayed with her for approximately one or two months. During this period of time, M.V. and D.V. "ran up" her cable and telephone bills, D.V. punched a hole in a wall, her son's expensive game system was broken, and all three children

"almost made [her] lose [her] job" when they fought at her office after school.[9] After the incident at her office, she called the social worker and told her she would no longer be caring for the children. Jocelyne brought the children to the caseworker and submitted a letter to the agency informing them that she could not keep the children. She additionally stated that M.V. threatened her husband and son, claiming he would call (presumably DCFS) to get them in trouble.

¶ 44    On cross-examination, Jocelyne admitted she was close with Vaval and would not want to see anything happen to her. She testified that C.V. went back to live with Vaval at a later date, but admitted C.V. was later removed from the home again. Jocelyne testified that she is aware that C.V. has no desire to return and live with Vaval. She stated she never saw M.V. hurt himself and only saw him turn his eyelid inside out. On re-direct, Jocelyne stated she did not believe Foster had hurt M.V. Jocelyne stated she would not lie to help Vaval, even if she were in trouble.

¶ 45    Barbara Williams testified she has worked for DCFS for 25 years—as a foster care caseworker, an intact family worker, a child protection investigator, in quality assurance, and as an administrative case reviewer. In 2009, Williams was a child protective investigator, meaning she investigated child abuse and neglect cases. In April 2009, Williams conducted an investigation after receiving a hotline call from M.V.'s school alleging that M.V. had bruises on his arm caused by his adoptive mother. When Williams interviewed M.V., she observed bruising on his arms and upper back area. M.V. told her that he was disciplined for acting out—that "his mommy [Vaval] disciplined him with a belt," and then "his second mommy [Foster] came home from work and disciplined him with a belt." Williams also interviewed D.V. and C.V., both of whom told her that

---

[9]She testified she brought the children to her office because she did not have a babysitter. After they fought, her supervisor asked her not to bring them back to the office because it was disruptive. However, she brought them back the next day and the supervisor again observed them fighting. Jocelyne lied and told her supervisor that the social worker was coming to get them, and she was allowed to keep her job.

M.V. was acting out and that both of their parents had disciplined M.V. C.V. additionally indicated that M.V. had been disciplined with a belt. When Williams questioned Vaval, Vaval told her that she did not physically discipline M.V. but that M.V. had behavioral problems and would normally self-inflict injuries. Foster similarly denied disciplining M.V. Furthermore, both Foster and Vaval denied that they lived together in the same home. Williams examined M.V.'s bunkbed and found there was nothing wrong with the bed so as to cause M.V.'s legs injuries. At some point in the investigation, Vaval eventually admitted to Williams that she had either "whooped" or "spanked" M.V. on the hand with a belt.

¶ 46    During the initial visit, Williams instructed Vaval to take M.V. to the doctor for an examination. Williams later spoke to the doctor who examined M.V. The doctor told Williams that she had concerns, as M.V.'s marks were not consistent with the explanation of how he received them. The doctor told Williams she would call back later to further discuss her concerns; however, Williams never received a call back from the treating physician. Despite repeated attempts to contact the physician, Williams was unable to speak with the doctor again. Williams testified she relies on a doctor's belief as to whether an injury rises to a level of abuse and neglect. To that end, if an investigator is unable to speak with a doctor regarding a child's injuries, that frustrates the investigator's ability to complete the investigation. Ultimately, Williams closed the investigation as "unfounded," since (1) there was insufficient evidence from the medical professional indicating that the discipline of M.V. had risen to the level of abuse, (2) it was the first report related to M.V., (3) M.V. had behavioral issues, (4) the adoptive mother wanted services, and (5) the children reported they were not afraid. Nevertheless, Williams informed Vaval that the doctor and DCFS had concerns and informed her that if there was a subsequent hotline call, there could be

consequences such as protective custody or opening the case up for family services. Accordingly, Williams recommended Vaval refrain from physically disciplining the children.

¶ 47       On cross-examination, Williams explained that a foster parent would not need DCFS approval for a normal routine medical appointment, but they would need DCFS consent for something like surgery, counseling, or therapy. Williams testified Vaval was cooperative with her investigation. She further stated she did not remove M.V. from Vaval's home because she did not believe he was in immediate risk of harm. Williams never asked to see the belt M.V. was whipped with because "everybody kind of conceded that he was disciplined with a belt." She could not recall Vaval offering an alternate explanation for the bruising on M.V.'s arms but did remember M.V. stating that when he was being spanked on the bottom, he tried to block the strikes with his arm. Williams explained that a case can be "indicated" for abuse or neglect without a doctor's opinion because those types of cases are "there, we know it." When cases are "gray," the investigators prefer a doctor give their medical opinion. In addition to not being able to reach the treating physician during her investigation, Williams was unable to reach M.V.'s caseworker or therapist. Williams was unaware that two other children (Foster's biological children) lived in the house with M.V. but stated she would have interviewed them if she had been informed. On re-direct, Williams clarified that DCFS consent is not required for a physician to examine a child's injury.

¶ 48       Twenty-five-year-old Sean Pierre Lemar Foster was subsequently called as a defense witness. Sean testified that Foster is his biological mother, but he also considers Vaval to be his mother. Sean lived with Vaval, Foster, and his brother Darrien until 2007 when M.V., C.V., and D.V. came to live with them. Sean estimated that, in 2008, he was 14 years old, D.V. was eight or nine, M.V. was seven or eight, C.V. was six or seven, and Darrien was three years old. Sean

detailed his home life between 2007 and 2009 as the children playing and having fun "until someone got – was in trouble either in school or at home." As the eldest brother, Sean interacted with his siblings by playing video games, watching television, and wrestling. Foster would drive the children to school in the mornings. Sean described M.V. as someone who sought attention. He explained that "most times" M.V. would get in trouble over little things or lie about someone else to get attention. M.V. never confided in Sean, but they were close and played together. When they lived together, Sean observed M.V. "hang his legs over the railings and just swing them around and then put his arms through the bed railing and move it a certain way." When Sean witnessed this, he would tell M.V. to stop.

¶ 49        Sean recalled one time when M.V. lied, claiming he did not break a PlayStation Portable (PSP). He explained that all the children had their own PSPs and he believed M.V. had broken his, since M.V. was the last one he had seen with it. After he told Vaval and Foster, his mothers concluded M.V. had broken Sean's PSP and replaced Sean's with M.V.'s. M.V. was upset with his punishment and pouted. Sean explained that if he and his siblings misbehaved and were disciplined, they had their privileges taken away and would be sent to their corresponding rooms. He denied either mother ever whipped or hit him. He also denied ever seeing either of his mothers whip or beat M.V., and never saw his mothers slap any of his siblings in their faces. M.V. never told Sean that either of their mothers was beating or hurting him physically. Sean testified that all his siblings were treated the same, regardless of whether they were biological or adopted. Lastly, Sean testified that Foster was in an accident at work in 2006, which caused injuries including "head damage," surgery, and resulted in "her right-side nervous system" being "all messed up." He explained Foster could barely walk, talk, or hold anything following the accident.

¶ 50        On cross-examination, Sean clarified that M.V. would drape his legs over the higher protective railing on the bunk bed when he would swing them. Sean recalled an occasion in approximately November 2009 when he was babysitting his siblings and had to call his mothers to come home after M.V. hit his head. Sean heard a thump in the bathroom, and when he went inside, M.V. was lying on the floor. On re-direct, Sean clarified that M.V. was not unconscious, since he ended up getting up once their mothers came home and checked on him. He stated he did not know if M.V. hitting his head was attention seeking behavior; rather, he heard a thump and ran into the bathroom to find M.V. on the floor.

¶ 51        Kylynn McMillian[10] was next called as a defense witness. McMillian is a school administrator living in Mobile, Alabama. Previously, she lived in Chicago and was employed as a supervisor at LCFS, a private foster care agency. In her LCFS role, she supervised up to eight case workers, attended meetings, developed case review plans, and attended court. M.V. and D.V. were in foster care with a relative when they were assigned to McMillian's "team" in 2006.[11] She testified that each case had a different goal—return home, guardianship, or adoption. M.V. and D.V.'s case did not have a return home goal due to parental lack of cooperation. M.V. and D.V. were originally removed from their mother's care when they were approximately two and three years old. They then lived with their maternal great aunt, who was older and had health issues. The great aunt was frustrated with the boys' behaviors and McMillian remarked that the boys "were really forbidden to move" when she came to visit. As a result, McMillian made alternate recommendations regarding the placement of D.V. and M.V.; ultimately, they were placed in the custody of Vaval and Foster. Prior to becoming a foster parent, Vaval underwent 60 hours of

_____

[10]On cross-examination, McMillian testified her name was previously Kylynn Brown.
[11]McMillian explained being assigned to her "team" meant that LCFS took over the children's case from either DCFS or another agency.

training. After D.V. and M.V. were placed with Vaval, they were categorized as "children needing specialization." McMillian testified that she had represented to Vaval that M.V. displayed behaviors such as: throwing things in the classroom, having tantrums, talking back to the teacher, acting "belligerent," and occasionally behaving defiantly.

¶ 52    McMillian visited the children (M.V., D.V., and eventually, C.V.) once they were placed in Vaval and Foster's residence—the first month she visited weekly, the second month she visited biweekly, and thereafter once a month. McMillian spoke to the minors privately, but M.V. never reported to McMillian that Foster beat him. Nor did M.V. ever disclose that Foster had punched him in the eye or that he was afraid of Vaval or Foster. McMillian never saw any unusual bruises or marks on his extremities. Had she seen marks on the children, she would have involved DCFS to initiate an investigation for abuse. For Vaval to adopt the children, they had to be in her home successfully and consistently for six months, she had to be compliant with all services and requests of LCFS, an adoption worker had to do a home study, and a court had to approve the adoption. McMillian testified that M.V. and D.V. both indicated they wanted to be adopted by Vaval. She learned in "family team meetings" that M.V. would "pick at his skin and create sores." McMillian explained the process for getting DCFS approval for doctor visits but explained that if there was an emergent issue, the children could be brought to any emergency room for care. She recalled "some situation" with M.V.'s eye when he was approximately four years old and explained "there was not a case of anybody punching him in the eye. That was nowhere in the medical records at all and I read them over and over and over again."

¶ 53    McMillian believed the Vaval home was a good placement for M.V., D.V., and C.V., and LCFS continued to monitor the home after the children had been placed with Vaval and Foster. Once the children were ultimately removed from the home, they came back to LCFS and were

assigned to another supervisor, although McMillian continued to consult with that supervisor. The children were placed in a non-relative, licensed foster home for approximately a month before they were removed at the request of the foster parent. That foster parent alleged that they were unhappy because M.V. had reported to the caseworker that the foster parent had stabbed M.V. with a pencil. The children were eventually placed in a foster home in Park Forest. Following the children's removal from the Vaval home, McMillian was never contacted by the CPD to discuss the case.

¶ 54    On cross-examination, McMillian testified she is aware that the juvenile court determined that M.V. was physically abused. She stated that, prior to the children's placement with Vaval, LCFS compiled a medical file and psychological history on M.V., which included the file from DCFS and the previous agency. McMillian testified that she could not recall a history of seizures contained within M.V.'s medical records. Neither did M.V.'s medical history have any sort of diagnosis that M.V. engages in self-harm. She clarified that the "team meetings" she earlier referenced were meetings between M.V. and D.V.'s relative caregiver (great aunt) and the caseworker. McMillian never witnessed M.V. inflict an injury upon himself, but after M.V. was placed in Park Forest, she observed him picking scabs on his arms. She ultimately conceded that she never believed the allegations of physical abuse and does not believe Foster was physically capable of the abuse alleged, despite the juvenile court's determination that M.V. was abused. She further testified that, to her, M.V. never looked as though he had been beaten with a wooden bat. On re-direct examination, McMillian recalled reviewing M.V.'s medical record and reading that

> "when he was younger, much smaller around maybe three or four, there was some
> sort of defect with his eye with the orbital type of thing. And I don't recall when the – when
> it went form the defect to a fracture or whatever, I don't know. But I know he was small
> and he was still with the great aunt when that happened."

She also clarified that she did not believe the abuse allegations since M.V. never had a concussion or a more serious injury that she would expect to see had he been beaten with a bat. Lastly, McMillian recollected speaking with M.V. after he was placed in Park Forest (sometime around 2015) and M.V. told her that he fractured his arm by banging it on the edge of a table, but it never hurt. He also told her he hit himself with large hairbrushes because it did not hurt.

¶ 55    Teresa Foster was next called as an adverse witness. Foster testified that she is employed by CPD but has been on "duty disability" since July 28, 2011. She testified that she recalled learning of M.V.'s eye condition in approximately March 2008. She had no idea how he developed the condition but had seen M.V. rubbing his eye on occasion. In 2008, the doctor at Comer told Foster that M.V.'s eye injury was a "defect," but Foster later learned that Doctor Roy had classified the injury as a fracture. She did not know what Vaval had been told regarding M.V.'s eye injury but was sure Vaval would have mentioned it being a fracture if a doctor had informed her of that fact.

¶ 56    When questioned regarding the detention note M.V. came home with on April 29, 2009, Foster testified she did not sign the document and could not recall if she had seen the note. She likewise could not recall if she was aware that M.V. received a detention on that date but stated if Vaval had signed a form acknowledging M.V. received a detention, Vaval would have told her. Foster agreed a DCFS hotline call was made on April 30, 2009. Following the call, M.V. was taken to Comer and was found to have a pattern of bruises on the back of his thighs, a bruise on his bottom, and bruises on both forearms. Foster conceded that the paperwork from Comers did not indicate bruising to the back of the knees. She did not recall observing any injuries on M.V. before he went to the emergency room on May 1, 2009. Foster learned M.V. told someone at school that his mom hit him with a belt; she thought he had accused Vaval until she later learnt he meant her.

M.V. then told investigators that he had caused the injuries himself. Foster recalled speaking to Williams and being informed that D.V. and C.V. had confirmed that she had disciplined M.V. with a belt. Foster denied ever hitting M.V. with a belt. Foster was aware the April 2009 investigation was closed and determined unfounded. She never learned from Vaval that DCFS had concerns regarding whether M.V.'s April injuries were self-inflicted.

¶ 57    Regarding the incident where M.V. hit his head in November 2009, Foster remembered receiving a call from Sean but did not recall him telling her M.V. had passed out. Foster was presented with her December 27, 2011 Independent Police Review Authority (IPRA) statement where she stated Sean called her to tell her M.V. had passed out. Once she and Vaval arrived home following that call, they did not seek any medical treatment for M.V.'s incident because "he got up." Foster testified that, on the morning of November 13, 2009, she had M.V., C.V., and D.V. with her when she stopped by her mother's house. Foster stated M.V. told her his tooth had been knocked out, so she sent him to the basement to find his tooth. Then she sent D.V. down to the basement to get M.V. and they all left after taking out the garbage. Foster denied M.V. was injured at her mother's house that morning and further denied that anybody did anything to injure M.V. in any way on the morning of November 13. Foster never observed any bruising on M.V. that day but conceded that M.V. had bruises all over his arms, back, and legs when he went to La Rabida later. She likewise never observed any injury on M.V. that would indicate he had a fractured arm before she dropped M.V. at school on November 13.

¶ 58    Roughly a month before the November 13 incident, M.V. had an incident where he was shaking. Foster testified M.V. was ill and had a high temperature. She agreed M.V. started shaking but denied that his eyes rolled back. Foster was again presented with her December 2011 IPRA statement where she stated M.V.'s eyes rolled back into his head "slightly." Foster put a wet towel

on M.V.'s head in an attempt to cool him down, but neither she nor Vaval took him to the doctor. She admitted this was the first time they had ever seen M.V. shake or his eyes roll back.

¶ 59        Foster spoke with Chicago Police Detective Thomas Cleary[12] on November 13, 2009 and told Cleary that M.V. had previously hurt himself but that he refused to tell her how he received his current injuries. She denied inflicting the injuries upon M.V. and informed Cleary that she was unaware how M.V. received his injuries. On November 17, 2009, Foster spoke with Chicago Police Detective Cikulin[13], at Area Two police headquarters. Foster told Cikulin that M.V. had hurt himself in the past and denied (1) hitting M.V. with a brush at any time, (2) punching M.V. in the eye, (3) grabbing M.V. by the neck, (4) hitting M.V. on the left arm, and (5) throwing M.V. to the ground. Foster conceded that, as a result of the November 2009 investigation, the State began proceedings to have the children removed from Vaval's custody. Following those proceedings, the court determined that all three minors were abused and that there was a substantial risk of injury to them if they remained living with Foster. Additionally, the court determined that M.V. had been physically abused and specifically found that Foster had inflicted the bruising to M.V.'s back and had fractured M.V.'s arm.

¶ 60        On cross-examination, Foster described a May 2006 automobile accident she was in while on duty and the injuries she suffered as a result—head trauma, c5-c6 spinal fusion, right-side nerve damage, a fractured arm, and injuries to her hands, knees, and back. She stated her ability to move has been affected because she has painful spasms if she turns a certain way. She is on medication for the nerve pain (Gabapentin), her right arm and hand tingles at times, she wears a brace on her

---

[12]Foster testified she understood the interview was part of an official police proceeding and that she was obligated by CPD rules to tell the truth.

[13]As before, Foster understood the interview was part of an official police proceeding and she was obligated to tell the truth. She was additionally informed of her Miranda rights prior to the interview.

wrist for carpal tunnel syndrome, and she had to attend physical therapy. Foster was never able to return to her position as a patrol officer and was placed on disability in July 2011.

¶ 61    Foster denied physically injuring M.V. on April 29, 2009 and stated she physically could not have done so. She denied lying during her statements to the CPD detectives. She stated she did not believe M.V. was having a seizure when she saw him shaking in October 2009. On the way home from school on November 13, 2009, Foster overheard D.V. urging M.V. to tell Foster something. When they exited the vehicle, D.V. was pulling on M.V.'s clothes and urging M.V. to "show her." Once inside the home, Foster told M.V. to take off his shirt and she observed "straight line marks" on his shoulders. Foster called Vaval and asked her to come home immediately. Foster sent M.V. to his room and left D.V. and C.V. in the kitchen, while she went upstairs to sleep. After Foster observed the injuries on M.V.'s shoulders, D.V. told her that M.V. was talking to a social worker at school. She denied ever beating the children before taking them to school. She denied physically harming M.V. or beating him with a bat, brush, or belt.

¶ 62    Next, Ronya Starks was called as a character witness for Vaval. Starks, a former CPD officer, had known Vaval for 17 years and was her patrol partner for approximately eight years. During that time, she came to know Vaval as reliable, even keeled, and someone everybody respected. Starks further testified that Vaval has an "unchallenged" reputation for truthfulness, honesty, and integrity. She never observed Vaval lose her temper or act in an abusive manner towards civilian adults or children.

¶ 63    Chicago Police Sergeant Shawn Kennedy was also called as a character witness for Vaval. He became Vaval's sergeant in 2014. Since then, Kennedy has never received a citizens' complaint regarding Vaval's conduct as a police officer nor did he receive any accusations of her acting over-aggressively or physically with a civilian. Kennedy described Vaval as being very

trustworthy, professional, levelheaded, even tempered, patient, and fair. He further testified he feels Vaval has a type of integrity, work ethic, and professionalism that is in line with his own.

¶ 64    Angela Fulton was called as a character witness for Foster. Fulton, who lives five or six houses away from petitioners, has known Vaval for approximately 42 years and has known Foster for about 12 years. She frequently communicates with Foster, considers her a friend, and sees her on a nearly weekly basis. Fulton would describe Foster as nice, generous, very honest, and the kind of person who looks out for others. Fulton never met the adopted children, never saw them misbehaving, and never observed Foster lose her temper with the children or strike them. Neither did she witness anything that caused her to believe Foster might be physically abusing the children. Fulton further stated that Foster is a person of integrity and is not deceptive or untruthful.

¶ 65    Dr. Ruby Roy, medical director for complex care at Advocate Children's hospital, next testified. After an exhaustive discussion of her qualifications, Roy was qualified as an expert in the medical diagnosis of child abuse. In November 2009, Dr. Roy was working at La Rabida hospital when she treated M.V. As a result of her treatment (and in conjunction with consultations with other professionals[14]), Dr. Roy diagnosed M.V.'s injuries as likely child abuse. Specifically, Dr. Roy concluded that the injuries she observed on M.V. did not fit the described mechanism for how she was told the injuries occurred. On November 15, 2009, Dr. Roy was the attending doctor on call for La Rabida's inpatient floor when she received a phone call from Doctor Jennifer Ziemianin, attending physician in the emergency room. Dr. Ziemianin had concerns regarding M.V.'s injuries. After Dr. Roy consulted with M.V. on November 16, 2009, she reviewed M.V.'s Comer records and called the University of Chicago child abuse physician. Despite parental reports of self-mutilation, Dr. Roy did not see any diagnosis in M.V.'s medical records to support such

---

[14]Roy spoke with resident Ellen Kennedy, social worker Ann Holman, child abuse doctor Kelly Staley, director of the behavior science department Brad Stolbach, and DCFS investigator Cole.

behavior. In Dr. Roy's professional opinion, follow-up medical care should have been sought for M.V. following the reported incidents in approximately October 2009 when M.V. had a seizure and passed out. Dr. Roy described M.V.'s November 2009 injuries in detail, including bruising to the back of the left shoulder, bruise on the back of his right shoulder, mid-back bruise, linear marks on the back of the right hip, bruise on the back of the left thigh, and a fractured ulna.

¶ 66          Dr. Roy opined that M.V. could not have physically caused the bruising to his back nor the bruising to the back of the legs (both of which would have taken a greater deal of force than the 46–48-pound 9-year-old M.V. would have been able to exert). Similarly, it would have been highly unlikely for M.V. to have been able to cause the "nightstick fracture"[15] to his left arm. After observing M.V. for his ten-day stay in the hospital, Dr. Roy described him as quiet and remarkably well behaved. Dr. Roy testified that she never questioned M.V. regarding how he received his injuries, but that he spontaneously volunteered information on November 17, 2009 to Izetta Middleton.[16] Dr. Roy hypothesized that M.V. may have changed his story and later claimed he caused the injuries because he "was a small, nine-year-old boy expecting to go back to this mother, the same mother that is telling people here is how these injuries occurred. He would be afraid to say anything different." Dr. Roy found the case to be "extremely disturbing because [M.V.] had been brought in multiple times for injuries. And – and the description was always that they were self-inflicted. And the disturbing piece to me is not just that but that many other doctors took that mom at her word." At the conclusion of Dr. Roy's treatment of M.V. she made several medical conclusions: (1) M.V.'s bruises were the result of physical abuse, as he is not physically capable

---

[15]Dr. Roy testified that a nightstick fracture is a category of fractures similar to that which is caused by a blunt object.

[16]M.V. told Middleton, without any solicitation, that "she" hit him with a stick and a belt, and that he could not play football the last Saturday (when his team was in the playoffs) because he was on punishment.

of causing bruising with that location and severity by self-mutilation; (2) M.V. was the victim of medical neglect for failure to provide appropriate and timely treatment of his arm fracture, as well as the seizure and syncope events; and (3) there was no documentation of psychiatric disorder and no evidence of self-mutilative behavior or any abnormal behavior in the hospital.

¶ 67    On cross-examination, Dr. Roy reiterated that M.V. never explained to her how he was hurt because she never asked him. She also conceded that she did not consider the delay between M.V. seeing an ophthalmologist in August 2008 and having eye surgery in November 2008 as attributable to Vaval's medical neglect; rather she agreed it probably had to do with DCFS consent procedures, as the date of injury was unknown. However, she testified the described mechanism for how the eye injury occurred (M.V. rubbing his eye) could not have caused the injury. Dr. Roy admitted that M.V.'s arm could have possibly broken from a fall but stated it would have to have been a "substantial fall" (i.e., from a run or a fall down steps). Nevertheless, she maintained that a "nightstick fracture" is much more likely to have been caused by induced blunt trauma.

¶ 68    Lastly, Vaval was recalled as a defense witness and testified regarding the intake questions she was asked during M.V.'s November hospital visit. She also testified that she remembered that M.V. played football on November 14, 2009 because he scored a touchdown for the wrong team.

¶ 69                    D. Board's Findings Regarding Vaval

¶ 70    Following the hearing, the members of the Board: (1) read and reviewed the record of the proceedings, (2) viewed the video recording of the entire evidentiary hearing, (3) listened to the hearing officer's oral report, and (4) conferred with the hearing officer. Thereafter, the Board issued a decision finding Vaval guilty of violating Rules 1, 2, 3, and 8 (Counts II, III, IV, and VI), and 2 and 14 (Count VII), that she: (1) whipped M.V. on his hands with a belt on April 29, 2009; (2) failed to protect M.V. from the beating he received from Foster on April 29, 2009; (3) would

never have taken M.V. for treatment of his injuries unless DCFS had ordered her to take him; (4) failed to seek treatment for M.V. after he exhibited serious symptoms in October 2009 and obvious physical injuries in November 2009; and (5) made a false statement to La Rabida medical staff and Dr. Roy when she told them that M.V.'s November 2009 injuries were self-inflicted.

¶ 71    However, the Board found Vaval not guilty of violating Rules 1, 2, 3, and 8, regarding the allegation that Vaval learned M.V. suffered an injury, which turned out to be a fracture to the child's orbital bone but failed to seek treatment for that injury in a timely manner.

¶ 72    Based upon her various violations, the Board determined, by unanimous vote, that cause existed to discharge Vaval. The Board considered the facts and circumstances of Vaval's conduct, as well as the evidence she presented in mitigation.[17] Nevertheless, the Board concluded that Vaval's accomplishments and positive evaluations do not mitigate the seriousness of her misconduct in this case. Unambiguously, the Board found that Vaval "physically mistreated, failed to protect, and failed to seek medical care for her nine-year-old adopted son." Finding that this conduct displayed a disregard for the child's safety and the law, the Board concluded that Vaval had undermined public confidence in the judgment of CPD's officers. Further, the Board found that Vaval's attempts to cover up her violation of the law was detrimental to her credibility and is a serious liability to CPD. Therefore, the Board determined that Vaval's conduct is sufficiently serious to constitute a substantial shortcoming which renders her unfit to maintain employment as a police officer.

¶ 73                        E. Board's Findings Regarding Foster

---

[17]Specifically, the Board pointed to the testimonies of McGlorthan, Fulton Starks, and Kennedy, as well as Vaval's complimentary career history, during which time she earned 30 total awards and had no sustained complaints on her disciplinary record.

¶ 74 Following the administrative hearing, the Board issued a decision finding Foster guilty of violating Rules 1, 2, 3, and 8 (Counts II, III, IV, and VI), and 2 and 14 (Count VII), that she: (1) caused the balance of the injuries to M.V. on April 29, 2009 when she beat him; (2) committed child abuse by physically abusing M.V. on November 13, 2009, causing him to suffer significant injuries; and (3) made false statements to Detective Cleary on November 13, 2009, and to Detective Cikulin on November 17 and December 11, 2009, when she denied hitting M.V. and inflicting the November 2009 injuries he sustained.

¶ 75 The Board determined, by unanimous vote, that cause existed to discharge Foster based upon her various violations. The Board considered the facts and circumstances of Foster's conduct, as well as the evidence she presented in mitigation.[18] Nevertheless, the Board concluded that Foster's accomplishments as an officer and her positive evaluations did not mitigate the seriousness of her misconduct in this case. The Board detailed that Foster had physically maltreated a nine-year-old child on two occasions, resulting in visible physical injuries requiring medical care. Moreover, it found that Foster's abuse of this young child showed a disregard for the law and brought discredit upon the CPD, thereby undermining public confidence in the judgment of its officers. Further, it found Foster attempted to cover up her criminal abuse by repeatedly falsely stating to detectives that she did not inflict any injuries on the child. The Board concluded that these material and false denials of her criminal activity render her unfit to be a Chicago police officer. Ultimately, the Board resolved that Foster's misconduct was incompatible with continued service as a police officer.

¶ 76                                    F. Administrative Review

---

[18]Specifically, the Board pointed to the testimony of Fulton, and Foster's 19-year career, during which time she earned 12 total awards and had no sustained complaints on her disciplinary record.

¶ 77     On September 27, 2019, petitioners filed a "Petition for Administrative Review" in the circuit court, arguing that the findings and decisions of the Board were against the manifest weight of the evidence and were contrary to law. Further, petitioners contended the Board's decision to discharge them was arbitrary, capricious, and unrelated to the requirement of the service. Some months later, petitioners filed a brief in support of their petition for administrative review, arguing that the Superintendent's charges should be barred under the doctrine of *laches*. Thereafter, the respondents filed a response to petitioners' memorandum, alleging that *laches* does not apply, that the Board's findings are consistent with the manifest weight of the evidence, and that the penalty of discharge is not arbitrary, capricious, or unrelated to the required services of Chicago police officers. Petitioners responded by filing a reply brief wherein they maintained *laches* should be applied and that the manifest weight of the evidence favors petitioners.

¶ 78     On January 5, 2021, after a hearing, the circuit court affirmed the Board's findings of fact and conclusions of law. Specifically, the court concluded that the hearing officer did not abuse its discretion in declining to apply *laches*, that the Board did not exceed its authority, and that the hearing officer made findings supported by the evidence in the record. Accordingly, the court found that the Board's decision to discharge Vaval and Foster was reasonable. Thereafter, petitioners timely filed the instant appeal.

¶ 79                                   III. ANALYSIS

¶ 80     On appeal, petitioners present the following issues: (1) whether the Superintendent's charges were barred by *laches*, (2) whether the Board's findings of guilt against petitioner Vaval are against the manifest weight of the evidence; and (3) whether the Board's findings of guilt against petitioner Foster are against the manifest weight of the evidence. The Superintendent counters that: (1) the Board's findings that petitioners engaged in child abuse and neglect and made

false statements to medical personnel and/or CPD detectives are not against the manifest weight of the evidence; (2) the Superintendent's charges are not barred by *laches*, where petitioners failed to raise the defense before the Board and failed to establish either extraordinary circumstances, unreasonable delay, or prejudice; (3) that the Superintendent may seek the termination of police officers based on criminal misconduct despite the lack of criminal charges being filed; and (4) that petitioners forfeited their asserted right to administer corporal punishment.

¶ 81　　　In an appeal from the judgment of an administrative review proceeding, we review the decision of the Board, not the circuit court. *Remus v. Sheahan*, 387 Ill. App. 3d 899, 901 (2009). Our review of an administrative agency's decision to discharge requires a two-step analysis. *Siwek v. Police Bd. of City of Chicago*, 374 Ill. App. 3d 735, 737 (2007). First, we determine whether the Board's factual findings are against the manifest weight of the evidence. *Id.* Second, we must determine whether those findings of fact provided a sufficient basis for the Board's decision of discharge. *Id*.

¶ 82　　　　　　　　　　　　　　　A. *Laches*

¶ 83　　　Petitioners first argue that the Board improperly rejected their doctrine of *laches* argument, when they were charged 10 years after the alleged improper conduct occurred and after the investigation of the matters had been closed. The Superintendent counters that petitioners forfeited the defense of *laches* as it was not raised before the Board. "*Laches* is an equitable defense that bars recovery by a litigant whose unreasonable delay in bringing an action for relief prejudices the rights of the other party." *People ex rel. Department of Human Rights v. Interstate Realty Management*, 2022 IL App (5th) 210161, ¶ 38. *Laches* differs from a statute of limitations in that a party must show that the unreasonable delay has prejudiced and misled them or has caused them to pursue a different course of action than they otherwise would have taken. *Id.* When asserting a

*laches* defense, the party asserting the doctrine bears the burden of establishing the defense by a preponderance of the evidence. *Cruz v. Dart*, 2019 IL App (1st) 170915, ¶ 55; *Kampmann v. Hillsboro Community School District No. 3 Board of Education*, 2019 IL App (5th) 180043, ¶ 15. The two necessary elements of *laches* are (1) prejudice to the opposing party and (2) lack of due diligence by the party asserting the claim. *Cruz*, 2019 IL App (1st) 170915, ¶ 54. Further, "the decision with respect to whether *laches* should be invoked is generally a discretionary matter." *Van Milligan v. Board of Fire & Police Commissioners of the Village of Glenview*, 158 Ill. 2d 85, 91 (1994).

¶ 84       Petitioners contend the Board waited ten years after the relevant events occurred to bring charges against them, thus causing "extreme" prejudice. Specifically, petitioners allege the delay (1) led to the unavailability of witnesses that could have aided in their defense and (2) impacted the witnesses' recollection of relevant events. The Board responds that petitioners forfeited any *laches* challenge when they failed to raise or develop the issue before the hearing officer. The Board further argues that it exercised due diligence, without improper delay, in bringing charges against Vaval and Foster. We note that " 'there is considerable reluctance to impose the doctrine of *laches* to the actions of public entities.' " *Cruz*, 2019 IL App (1st) 170915, ¶ 54 (quoting *Van Milligan*, 158 Ill. 2d at 90). "[W]hile governmental bodies do not enjoy total immunity from *laches*, the doctrine is to be applied sparingly against them and only under compelling, unusual[,] or extraordinary circumstances." (Internal quotation marks omitted.) *City of Countryside v. City of Countryside Police Pension Board of Trustees*, 2018 IL App (1st) 171029, ¶ 65 (quoting *Van Milligan*, 158 Ill. 2d at 90). This is due to valuable public interests that " 'may be jeopardized or lost by the negligence, mistakes or inattention of public officials.' " *Id.* (quoting *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 447-48 (1966)).

¶ 85    The timing in the instant case is undisputed: the incidents occurred in June or July 2008, April 29, 2009, October 2009, November 13, 2009, November 15, 2009, November 17, 2009, and December 11, 2009; Vaval and Foster gave statements to IPRA in 2011 and 2016; juvenile court proceedings regarding the placement of the children occurred in 2012; the Superintendent filed his complaint before the Board on January 3, 2019; the hearing occurred before Thomas E. Johnson on June 18, 19, and 26, 2019; and the Board issued its decision on August 22, 2019.

¶ 86    It is well settled that on administrative review, a party forfeits any argument, issue, or defense that it failed to raise in proceedings before the administrative agency. *Demesa v. Adams*, 2013 IL App (1st) 122608, ¶ 52; see also *Carpetland U.S.A., Inc. v. Illinois Dept. of Employment Security*, 201 Ill. 2d 351, 396-97 (2002) (generally, issues or defenses not raised before an administrative agency will not be considered for the first time on administrative review); *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 212 (2008) (a defense not presented at an administrative hearing is procedurally defaulted and may not be raised for the first time before the circuit court). As administrative review is confined to proof offered before the agency, challenges should be asserted on the record before the administrative agency. *Carpetland*, 201 Ill. 2d at 397. This allows opponents an opportunity to present evidence and refute the asserted argument in the tribunal that will decide the case. *Id.*; *Cinkus*, 228 Ill. 2d at 213.

¶ 87    We recognize that waiver is a limitation on the parties and not a limitation upon the jurisdiction of this court. See, *e.g.*, *Holt v. City of Chicago*, 2022 IL App (1st) 220400, ¶ 9. This court further acknowledges that "the doctrine of waiver may be relaxed when necessary to maintain a uniform body of precedent, or where the interests of justice so require." *Carpetland*, 201 Ill. 2d at 397. There are no such compelling circumstances here.

¶ 88        Our review of the record demonstrates that the petitioners failed to raise this claim at the evidentiary hearing before the administrative board, and further failed to respond to the hearing officer's mention of a potential *laches* defense[19]. While this court recognizes that an inordinate amount of time passed between the incidents in 2008-2009 and the Superintendent's January 2019 filing of charges against petitioners[20], we find that the petitioners' *laches* claim is forfeited, where they raised the contention for the first time before the circuit court on administrative review. Accordingly, as the petitioners failed to raise a *laches* argument before the administrative agency, we decline to reach the merits of their claim.

¶ 89                                B. The Board's Factual Findings

¶ 90        Petitioners first contend the Board's factual findings were against the manifest weight of the evidence. As an administrative agency, the Board's findings and conclusions on questions of fact shall be held to be *prima facie* true and correct on review. 735 ILCS 5/3-110 (West 2020). A Board's decision regarding factual findings is only contrary to the manifest weight of the evidence "if, after reviewing the evidence in a light most favorable to the agency, we conclude that no rational trier of fact could have agreed with the agency's decision and an opposite conclusion is clearly evident." *Daniels v. Police Bd. of City of Chicago*, 338 Ill. App. 3d 851, 858 (2003).

---

[19]During the hearing, Johnson specifically stated: "I'm not suggesting there is a *laches* defense here, which would require specific evidence of material prejudice. I'm just saying when the City comes and says this is shocking what has happened and these officers have to be discharged, but they somehow found other things to do for nine years – ." The record reveals no other mention of *laches* until the matter came before the circuit court.

[20]As the Board noted in its "Findings and Decisions,"

> "[T]he length of time for disciplinary cases to reach the Board is excessive. The Board continues to be deeply troubled by cases such as this, in which the charges were filed more than nine years after an incident occurs. In this case, the impact was particularly serious [for] the victim, who was eight years old when abused and is now an adult. While the delay has no effect on the Board's decisions as to the facts or outcome of this case, and there is no evidence in the record that the delay prejudiced either Respondent, the delay of ten years is noted for the purpose of providing another example of excessive delay to emphasize that eliminating excessive delays must continue to be a priority in resolving allegations of misconduct and improving police accountability."

" 'When sufficient evidence in the record supports an administrative agency's findings, the decision will not be reversed.' " *Orsa v. Police Board of Chicago*, 2016 IL App (1st) 121709, ¶ 47 (quoting *Collura v. Board of Police Commissioners*, 135 Ill. App. 3d 827, 839 (1985)). The Board's findings of facts will not be reversed simply because we might have ruled differently, or an opposite conclusion might be reasonable. *Roman v. Cook County Sheriff's Merit Bd.*, 2014 IL App (1st) 123308, ¶ 67. Furthermore, "[w]e may not substitute our judgment for the Police Board's credibility determinations." *Franko v. Police Board of the City of Chicago*, 2021 IL App (1st) 201362, ¶ 46. See *Gounaris v. City of Chicago*, 321 Ill. App. 3d 487, 490 (2001) ("Because the weight of the evidence and the credibility of witnesses are uniquely within the province of the administrative agency, there need only be some competent evidence in the record to support its finding." "[Citation.]").

¶ 91                                  1. Yasmina Vaval

¶ 92        Based upon our review of the record, we cannot say that the police board's findings regarding Vaval were against the manifest weight of the evidence. The evidence at hearing consisted of Vaval's adverse testimony; the testimonies of: M.V., C.V., Vaval's sister Jocelyne, DCFS investigator Williams, Sean Foster, LCFS supervisor McMillian, Doctor Roy, and character witnesses Starks and Kennedy; the stipulation of DCFS investigator Cole; prior statements/interviews of the children, petitioners, and doctor; a plethora of medical records from M.V.'s various injuries; the juvenile court adjudication; various reports from DCFS and CPD; and photographs of M.V.'s injuries.

¶ 93        Regarding the April 29, 2009 injuries, M.V. testified that he did not recall going to the hospital at the beginning of May 2009. Vaval points to this lack of testimony as proof that the Board's guilty finding was against the manifest weight of the evidence. However, the Board relied

upon Vaval's admission that she had spanked M.V.'s hands; the contemporaneous statements M.V., D.V., and C.V. made to school staff, DCFS caseworkers, hospital personnel, and police; the impetus behind the spanking (M.V. was punished for the school detention he received); and Doctor Roy's medical opinion (proffered before the juvenile court) that M.V.'s injuries were indicative of child abuse and neglect. Further, the Board gave credence to Williams's testimony that the railing of M.V.'s bed could not have injured M.V. in the way Vaval described. We are unimpressed by Vaval's attempts to minimize M.V.'s injuries by pointing out that they were not "substantial" and that he was not hospitalized in May 2009. This corroborating evidence undoubtedly supports the Board's findings that Vaval violated the Department's rules of conduct. See *Orsa*, 2016 IL App (1st) 121709, ¶ 47 (an agency's decision will not be reversed absent a finding of insufficient supporting evidence).

¶ 94       Concerning the October 2009 charge against Vaval, the Board stated it did not find Vaval and Foster's testimony to be credible when petitioners testified that M.V. did not have a seizure and was "faking he passed out." The Board found this testimony was intended to minimize M.V.'s symptoms and stood in direct conflict with La Rabida's medical staff's contemporaneous recordings from his November 2009 visit. Ultimately, the Board determined that Vaval only reported M.V.'s seizure and loss of consciousness episodes to medical personnel after DCFS ordered her to bring M.V. to the hospital. After Vaval reported these events, the hospital performed an MRI and cardiac monitoring on M.V. While the results were unremarkable, the Board concluded that it was of no moment that there was no clinical confirmation of a seizure condition because the real question was why Vaval failed to seek medical attention for these problems on her own.

¶ 95        Similarly, the Board determined it was clear that Vaval did not seek medical care after M.V.'s November 13, 2009 injuries until Cole insisted he be taken to the hospital for an evaluation. The Board found credible the contemporaneous statements of M.V., D.V., and C.V. regarding the abuse M.V. suffered. In November 2009, D.V. and C.V. both related that they had previously been whipped with a belt or their mother's hand. Neither had ever seen M.V. hurt himself. Also, Foster's biological son Sean confirmed that the mothers hit the children with a belt or their hand. The Board likewise determined that M.V. and C.V.'s testimony before the Board was credible based on its observations of the witnesses during their testimony. The Board further determined that M.V.'s recantations at the hospital were "meaningless," given the presence of Vaval. While the Board recognized that M.V. gave varying accounts of how the injuries occurred, they found that when M.V. was outside the presence of Vaval and Foster, he was generally consistent in his claims that Foster had beaten him. It found M.V.'s inconsistent statements could be explained by his fear of returning home after contradicting Vaval's accounts. These determinations were appropriate, where "it was within the Board's province to determine the credibility of the witnesses and the weight to be given to [the] evidence." *Cruz*, 2019 IL App (1st) 170915, ¶ 45. Additionally, the Board iterated that Dr. Roy's testimony corroborated M.V.'s testimony regarding the nature and extent of M.V.'s injuries. Specifically, that M.V.'s injuries did not align with Vaval's described mechanism of how M.V. was injured. Overall, the Board found Dr. Roy's testimony that M.V.'s November injuries were caused by child abuse to be unrebutted and convincing. Moreover, there is ample evidence in the record that the only allegations of M.V. engaging in self-harm or self-mutilation came from Vaval and Foster (and M.V., when in Vaval's presence).

¶ 96        Despite Vaval's repeated attempts to prove there was conflicting testimony presented at the administrative hearing, " '[c]onflicts in witness testimony do not constitute a sufficient reason

to reverse an administrative agency's decisions, since the agency's responsibility is to resolve the conflicting evidence.' " *Orsa*, 2016 IL App (1st) 121709, ¶ 47 (quoting *Collura*, 135 Ill. App. 3d at 839). The Board appropriately weighed the evidence that was presented and assessed the credibility of the witnesses. It is not our job to substitute our judgment for that of the Board. See *Cruz*, 2019 IL App (1st) 170915, ¶ 49. Therefore, we find the Board's determinations of Vaval's guilt were not against the manifest weight of the evidence.

¶ 97        We similarly reject Vaval's claim that the Board wrongly charged her with violating the rules of conduct for "committing a domestic battery" when she was never criminally charged for the same conduct. While it is true that Vaval was never charged with, nor found guilty of, the criminal offenses of domestic battery (720 ILCS 5/12-3.2) or child endangerment (720 ILCS 5/12-21.6), the Board is authorized "to adopt rules and regulations for the governance of the police department of the city." Chicago Municipal Code § 2–84–030 (amended Sept. 8, 2011). The CPD Rules of Conduct were created pursuant to that authority. Contrary to Vaval's assertions, the Board was not adjudicating Illinois criminal statute offenses. The law is clear that the Board may proceed with administrative charges based on the violation of a criminal statute, regardless of whether criminal charges are initiated. As the burdens of proof are different, being charged criminally and administratively are not the same thing, nor are they in some way mutually exclusive. See *Daley v. El Flanboyan Corp.*, 321 Ill. App. 3d 68, 75 (2001) (the burden of proof in a criminal case is beyond a reasonable doubt, versus a preponderance of the evidence in an administrative proceeding); accord *Grames v. Illinois State Police*, 254 Ill. App. 3d 191, 204 (1993). Further, even if Vaval had been charged criminally, and subsequently found not guilty, such a result would not preclude a finding of guilty in a civil proceeding based on the same allegations. See *id.*; *In re T.D.*, 180 Ill. App. 3d 608, 612 (1989).

¶ 98        Finally, Vaval contends that she should not have been found guilty since she was entitled, as their adoptive mother, to inflict corporal punishment on her children. While Illinois courts have recognized that a parent's right to corporally punish their child "encompasses the right to care for, control, and discipline one's own children," it must "be balanced against the State's legitimate interest in preventing and deterring the mistreatment of children." *People v. Green*, 2011 IL App (2d) 091123, ¶ 14. A parent's right to discipline their child " 'must be exercised within the bounds of reason and humanity.' " *People v. Ball*, 58 Ill. 2d 36, 39 (1974) (quoting *Fletcher v. People*, 52 Ill. 395, 297 (1869)). Consequently, the parental right of discipline is "limited by a standard of reasonableness, not malice." *Green*, 2011 IL App (2d) 091123, ¶ 20. Additionally, "the degree of injury inflicted upon a child is not the exclusive or determinative factor in evaluating whether the discipline exceeded the bounds of reasonableness." *Id*. ¶ 24; see *In re J.P.*, 294 Ill. App. 3d 991, 1004 (1998) (courts are to consider factors including: the severity and location of the injury; use of an instrument; pattern and chronicity of similar incidents of harm; the child's age, medical conditions, physical, mental, emotional, or developmental disabilities; and the parent's history of reports of abuse and neglect). As this argument was not raised before the Board, it is forfeited. See *Keeling v. Board of Trustees of Forest Park Police Pension Fund*, 2017 IL App (1st) 170804, ¶ 45 (issues and defenses not raised before the administrative agency are forfeited on administrative review).

¶ 99        Forfeiture aside, we find unpersuasive Vaval's suggestion that she was authorized to inflict, or allow to be inflicted, broken bones and severe bruising on a small child under her care. It is apparent from the record that the Board could find that Vaval's punishments were excessive considering the sheer extent of M.V.'s injuries and the proffered testimony regarding his physical, cognitive, and emotional delays.

¶ 100        Clearly, this evidence—taken in its entirety, in a light most favorable to the Board— supported the Board's determination that Vaval disregarded her duty and seriously abused her authority as a police officer. This is not a case where there is no evidence in the record to support the agency's decision, and the Board's decision must therefore be upheld. Compare *Basketfield v. CPB*, 56 Ill. 2d 351 (1974) (reversing the agency's decision that the police officer failed to report an incident where there was no evidence presented to support a conclusion that the delay was unreasonable) *with Cruz*, 2019 IL App (1st) 170915 (upholding the agency's decision where there was supporting evidence in the record). Accordingly, it was not against the manifest weight of the evidence for the Board to determine that Vaval's conduct was violative of the Department's rules and regulations regarding the conduct of police officers. Specifically, we affirm the Board's findings that Vaval violated Rule 1's prohibition on conduct which violates any law or ordinance, Rule 2's prohibition on conduct impeding the Department's efforts to achieve its policy and goals or discrediting the Department, Rule 3's prohibition on failure to promote the Department's efforts to implement its policy or accomplish its goals, Rule 8's prohibition against disrespecting or maltreating any person whether on or off duty, and Rule 14's prohibition on making a false written or oral report.

¶ 101                                    2. Teresa Foster

¶ 102        Here, the evidence, consisting of, *inter alia*, (1) Foster's adverse testimony, (2) Foster's prior statements/interviews, (3) M.V. and C.V.'s testimony before the administrative hearing and their past accounts to DCFS investigators and medical personnel, (4) Dr. Roy's professional opinion that M.V. had been the victim of child abuse, (5) contemporaneous photographs of M.V.'s injuries, and (6) the multitude of medical records, supported the Board's determination that Foster

"physically maltreated a nine-year-old child on two occasions," and then "attempted to cover up her criminal abuse" by repeatedly lying to CPD detectives.

¶ 103    Foster argues that there are consequential variances in M.V.'s accounting of how he received his injuries in April and November 2009. Accordingly, she argues, M.V.'s credibility was impaired and the Board was required to dismiss the accusations against Foster. As aforementioned, the hearing officer found M.V. and C.V.'s testimonies to be credible. In fact, the Board stated that it found C.V.'s testimony regarding the injuries inflicted upon him (on separate occasions) by Foster to be "particularly convincing." The hearing officer and the Board, however, disbelieved Foster's testimony that she did not beat M.V. and that his injuries were self-inflicted. The Board found Foster's insistence that she did not inflict M.V.'s injuries and had no idea how they may have occurred, when measured against the medical records and Dr. Roy's testimony, rendered her "absolutely" incredible. See *Cannici v. Department of Employment Security Board of Review*, 2021 IL App (1st) 181562, ¶ 48 ("the Board, as the fact finder, was permitted to disbelieve testimony that was contradicted by the circumstances or inherently improbable."). Foster essentially requests that we reweigh the evidence and make credibility determinations. We are not at liberty to do so. See *Chisem v. McCarthy*, 2014 IL App (1st) 132389, ¶ 21 (it is the Board's purview to make credibility determinations and assign weight to testimony and other evidence; we will not substitute our judgment for that of the Board).

¶ 104    As detailed above, we correspondingly reject Foster's suggestion that the Board improperly determined she was guilty of injuring M.V. since she was entitled to inflict corporal punishment on the children as a custodial parent. This argument is forfeited, as it was not raised before the Board. It is well settled that on administrative review, a party forfeits any argument, issue, or defense that it failed to raise in proceedings before the administrative agency. *Demesa*, 2013 IL

App (1st) 122608, ¶ 5. Given Foster's repeated denials (in various interviews, statements, and testimonies) that she ever—in any physical way, shape, or form—punished the children, we find it contradictory that she now claims she did inflict corporal punishment to support her challenge under the manifest weight standard.

¶ 105    Lastly, we find Foster's argument that she was physically unable to inflict the injuries of which she was accused to be unpersuasive. While the record does indicate that Foster was in a serious automobile accident in 2006 and suffered numerous injuries therefrom, the Board weighed this evidence against the injuries M.V. incurred and found she was physically capable and did abuse M.V. We will not disrupt this credibility determination.

¶ 106    In this case, the record clearly supports the Board's determination that Foster disregarded her duty and seriously abused her authority as a police officer when she physically maltreated M.V., causing injuries that required medical care. Accordingly, it was not against the manifest weight of the evidence for the Board to determine that Foster's conduct was violative of the Department's rules and regulations regarding the conduct of police officers. Specifically, we affirm the Board's findings that Foster violated Rule 1's prohibition on conduct which violates any law or ordinance, Rule 2's prohibition on conduct impeding the Department's efforts to achieve its policy and goals or discrediting the Department, Rule 3's prohibition on failure to promote the Department's efforts to implement its policy or accomplish its goals, Rule 8's prohibition against disrespecting or maltreating any person whether on or off duty, and Rule 14's prohibition on making a false written or oral report.

¶ 107                                    C. Cause for Termination

¶ 108    We next determine whether the Board's findings of fact "provide a sufficient basis for the agency's conclusion that cause for termination does or does not exist." *Siwek*, 374 Ill. App. 3d at

737. An administrative agency's finding of cause for discipline "demands the respect of the court," *Swanson v. Board of Police Commissioners,* 197 Ill. App. 3d 592, 606 (1990), and we correspondingly "will not disturb the finding of cause for discharge unless the finding is arbitrary, unreasonable, or unrelated to the requirements of service." *Remus*, 387 Ill. App. 3d at 904.

¶ 109    A police officer may not be discharged without cause. 65 ILCS 5/10-1-18(a) (West 2020). Our supreme court has defined "cause" as " 'some substantial shortcoming which renders [the employee's] continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as good cause for his [discharge].' " *Lesner v. Police Board*, 2016 IL App (1st) 150545, ¶ 45 (quoting *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 105 (1983)). The Board stands in the best position to determine the effect of a police officer's conduct on the Department, not the court of review. *Id.* Accordingly, we give considerable deference to the Board's determination of cause. *Valio v. Board of Fire & Police Commissioners*, 311 Ill. App. 3d 321, 330-31 (2000)). In reviewing an administrative discharge decision, "we may not consider whether we would have imposed a more lenient disciplinary sentence," rather, our "review is limited to a determination of whether the Board acted unreasonably or arbitrarily by selecting a type of discipline that was inappropriate or unrelated to the needs of the service." *Krocka v. Police Board of the City of Chicago*, 327 Ill. App. 3d 36, 48 (2001) (citing *Wilson v. Board of Fire & Police Commissioners*, 205 Ill. App. 3d 984, 992 (1990)).

¶ 110    Petitioners here do not raise the argument on appeal that their conduct on the dates in question does not warrant dismissal. Rather, they simply argue that the findings of guilt are against the manifest weight of the evidence.

¶ 111     Nonetheless, the record indicates that the Board, in assessing the penalty here, thoroughly considered all witness testimony regarding petitioners' conduct, the alleged mechanisms behind M.V.'s injuries, the evidence proffered at the hearing, and the evidence petitioners offered in mitigation. The Board deemed that discharge was an appropriate sanction because Vaval and Foster's conduct showed a disregard for M.V.'s safety, "for the law, and brought discredit upon the Chicago Police Department, thereby undermining public confidence in the judgment of its officers and the Department's mission." The Board further found that the petitioners' intentional and materially false statements rendered them unfit to be police officers, as "a police officer's credibility is at issue in both the prosecution of crimes and in the Police Department's defense of civil lawsuits."

¶ 112     Illinois courts have repeatedly "emphasized that 'a law-enforcement officer is in a unique position of public trust and responsibility.' " *Remus*, 387 Ill. App. 3d at 904 (quoting *Lewis v. Hayes*, 152 Ill. App. 3d 1020, 1025 (1987)). "Officers must act in accord with 'their most fundamental duty as law enforcement officers—to act to protect the public.' " *Id.* (quoting *People v. Sorice*, 182 Ill. App. 3d 949, 956 (1989)). In the present case, petitioners ignored their duties to uphold the law and brought discredit upon the CPD when they engaged in child abuse, thereby undermining the public's trust of and confidence in its officers. The efficacy and discipline of a police force is impaired when a police officer fails to abide by the laws he has sworn to enforce. *Krocka*, 327 Ill. App. 3d at 48-49. Accordingly, we conclude that the Board's finding of cause for discharge was not arbitrary, unreasonable, or unrelated to the requirements of petitioners' service as police officers in the CPD.

¶ 113                                   IV. CONCLUSION

¶ 114    Based on the foregoing, we conclude that the Board's decision to terminate petitioners' employment as Chicago police officers was not erroneous and we therefore affirm the Board's August 22, 2019 decision. Accordingly, the January 5, 2021 order of the circuit court of Cook County affirming that termination is affirmed.

¶ 115    Circuit court judgment affirmed.

¶ 116    Board decision affirmed.